PRESTON AND JOYCE MASSENGILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Massengill v. Commissioner
Docket No. 7003-87.
United States Tax Court
T.C. Memo 1988-427; 1988 Tax Ct. Memo LEXIS 458; 56 T.C.M. (CCH) 107; T.C.M. (RIA) 88427; September 8, 1988. Preston and Joyce Massengill, pro se. Vallie C. Brooks, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In his notice of deficiency, respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax - Section
Year
Deficiency
[1] 6651(a) 6653(a)(1)
6653(a)(2)
6659
1982
$ 9,096.32
$ 1,540.86
$ 454.82
*
$ 1,707.60
1983
6,426.04
901.29
321.30
**
1,427.70
1984
3,328.65
39.68
166.43
***
925.80
Respondent determined further that the underpayments of taxes for each of the three years are subject to interest at a rate determined *460 under section 6621(d). [2]
After concessions, the issues for decision are: (1) Whether petitioners are entitled to depreciation and investment tax credit for cattle and other property; (2) whether respondent erred in making other adjustments to petitioners' income; (3) whether petitioners are liable for additional self-employment tax; (4) whether petitioners are liable for additions to tax under sections 6651(a), 6653(a)(1), 6653(a)(2), and 6659; (5) whether petitioners' underpayments are subject to the rate of interest provided by section 6621(c); and (6) whether petitioners are liable for damages under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. [3]
*461 Petitioners resided in Little Rock, Arkansas, when they filed their petition in this case. They filed joint Federal income tax returns for each of the years at issue as follows: Year
Date Filed
1982
6/14/84
1983
7/29/86
1984
5/28/85
Petitioner Preston W. Massengill ("petitioner") was self-employed as a salesman during 1979 through 1982. During 1979 and through March of 1980, he sold prepackaged family trust kits. The kits included information and forms for establishing a living trust to which purchasers could transfer their lifetime services in an attempt to shift the tax burden on their income to the trust. During 1979, petitioner sold a family trust kit to Mr. Estle Gardner ("Estle")") of Newark, Arkansas. After the purchase, Estle sought petitioner's advice regarding his personal financial affairs. Estle introduced petitioner to his son, Johnny Gardner ("Johnny"). Johnny and his wife, Nancy, raised cattle and were interested in a cattle-breeding technique called embryo transfer. Although they had no experience with the technique, they had read about it in several agricultural magazines. Embryo transfer is a process that has been developed during *462 the last 20 years whereby a fertilized embryo is transferred from a donor animal to a recipient animal so that the recipient animal will bear a calf with the genetic characteristics of the donor animal. For example, a cow with superior genetic traits will be injected with drugs to make her super-ovulate, or produce a number of eggs. The eggs are then fertilized by artificial insemination, removed from the cow with superior genetic traits, and placed in a cow with inferior genetic traits. Estle asked petitioner to visit Johnny's ranch, which he did in October of 1981. Petitioner was impressed with Johnny's knowledge of cattle breeding, and made arrangements with Johnny to enter into an embryo transfer program using Johnny's herd and ranch. Petitioner was to provide Johnny with technical information about embryo transfers and was to arrange a program for marketing the cattle involved in the embryo transfer program. Petitioner accordingly devised a plan to raise money from outside investors by selling the calves produced through embryo transfers to investors. In December of 1981, after his meeting with Johnny, petitioner convinced Robert F. Friedl ("Friedl") to purchase 100 head *463 of cattle from Johnny and Nancy. A projected cash flow statement that was prepared for Friedl emphasized that the purchase of the cattle would yield: A. Investment tax credit B. Interest deduction C. Depreciation deduction D. Investment profit potential
Friedl agreed to pay $ 200,000 for the cattle. He paid $ 20,000 down and signed a promissory note agreeing to pay the $ 180,000 balance in five years with interest thereon payable annually at the annual rate of 10 percent. Friedl and petitioner executed an agreement which provided that 25 of the 100 cattle were being purchased on petitioner's behalf. Petitioner paid Friedl $ 5,000 of his $ 50,000 share of the purchase price and agreed to pay the $ 45,000 balance in five years with interest thereon payable annually at the annual rate of 10 percent. After Friedl agreed to purchase the cattle, he signed a management contract with Johnny under which Johnny was to, inter alia, "care for, breed and feed [the 100 cattle] or replacements and their progeny" for five years. The contract provided further that Johnny was obligated to accept promissory notes from future investors in payment of the balance due on the purchase *464 price of the cattle. Petitioner signed the management contract on behalf of Johnny as agent for Johnny Gardner Ranches. Under the terms of the management contract, all calves born by the 100 cattle during the five years were to be sold and the net sales proceeds were to be divided as follows: Percent to
Owner of
Owner of
Johnny
Recipient Cow
Donor Cow
Slaughter Calves
90%
10%
0%
Super Calves
40%
40%
20%
The management contract defined "super calves" as calves that were appraised for and sold for "not less than 200% of the latest Chicago market feeder calf price quotation preceding the date of sale" and those which had been approved by Johnny "as an embryo transfer donor or herd bull." All other calves were "slaughter calves." Although the management contract obligated Friedl to pay all of the expenses incurred by Johnny related to the 100 cattle, it provided that Johnny's share of the net sales proceeds from calves born to the cattle was to be retained by Johnny as full payment for the expenses. Although the contract provided that "title and ownership" of the 100 cattle "shall be in and remain in the name of [Friedl] until final *465 settlement of this contract," it also provided that the 100 cattle would "remain in the possession of Johnny Gardner and will be managed by him while any indebtedness remains." At or about the same date that Friedl agreed to purchase the 100 cattle, Estle loaned petitioner $ 37,526.55. The loan was payable, with interest at an annual rate of 10 percent, on December 14, 1982. Petitioner paid $ 5,000 of the loan to Friedl as the $ 5,000 down payment on 25 of the 100 cattle that Friedl was to purchase from Johnny and Nancy. Petitioner reloaned $ 15,000 of the loan amount to a corporation that was wholly owned by Friedl and Friedl's wife. The corporation then conveyed the $ 15,000 to Friedl's children in return for the children's assumption of the corporation's $ 15,000 debt to petitioner. The children then paid the $ 15,000 to Friedl in exchange for stock in the corporation. Friedl then used the $ 15,000 along with the $ 5,000 paid to him by petitioner to make the $ 20,000 down payment on the 100 cattle. As of June 5, 1985, the only payments that petitioner had made for his share of the cattle were the original $ 5,000 down payment and one $ 4,500 interest payment in December *466 of 1982. In the spring of 1982, petitioner traveled to Texas A&M University to meet with Dr. David L. Morris. Dr. Morris was familiar with embryo transfer and advised petitioner that, as then practiced, it was not a good investment for a farmer unless he had sufficient monies to do extensive research. On June 20, 1982, Estle signed a contract designating petitioner the exclusive sales agent for his cattle for 10 years. The contract provided that Johnny Gardner Ranches would sell cattle only through petitioner during that period and that petitioner would be entitled to a 10-percent commission on all sales. Johnny signed an identical contract on July 15, 1982. On September 27, 1982, petitioners granted Estle a $ 37,000 mortgage on their home to secure their $ 37,526.55 debt to him. On December 20, 1982, Friedl and petitioner executed an agreement which provided that Friedl was to purchase 25 cows from Estle on petitioner's behalf without disclosing the fact that he was representing petitioner. The agreement specified that petitioner was to pay Friedl a down payment of $ 5,000 of the $ 50,000 purchase price and that he was to pay the balance, with interest, in five years. *467 Friedl purchased the 25 cows from Estle on December 27, 1982. The cows were subject to a management contract similar to the one covering the 100 cattle Friedl has agreed to purchase in December of 1981. After the execution of the agency contracts, Johnny and Estle became discouraged about the prospect of making a profit in embryo transfer. They believed that the embryo transfer project provided no benefit to them, and they refused to carry out petitioner's plan. In April of 1983, Estle dismissed petitioner from the 10-year agency contract with Johnny Gardner Ranches and demanded repayment of his $ 37,526.55 loan to petitioner. Estle also demanded an accounting for money that petitioner had allegedly taken without authority from the Bank of Newark. At this point, petitioner ceased making payments on the cattle that he had purchased through Friedl. In May of 1984, Estle filed a complaint in an Arkansas state court seeking to foreclose on the $ 37,000 mortgage he held on petitioners' home. Petitioners filed a cross complaint praying that the mortgage be set aside and that they be paid $ 450,500 for unpaid commissions, loss of income, and libel or slander. Petitioners and *468 Estle subsequently signed an agreement settling their complaints against each other. The settlement agreement provided for the cancellation of petitioners' $ 37,526.55 debt to Estle and of Friedl's $ 15,000 debt to petitioners, as well as the satisfaction of all security given for those debts. The settlement agreement did not mention the cattle that petitioner had purportedly purchased. As of June 5, 1985, all the cattle remained in Johnny and Nancy's possession and were worth less than the balance owed on them. Petitioners reported the following amounts of income on their joint Federal income tax returns for the years at issue: 1982
1983
1984
Wages
$ 20,140.80 $ 20,966.40 $ 22,512.80 Intr. & Dividends
959.56 184.26 197.30 Schedule C Loss
(4,284.53)
(11,528.27)
(20,542.68)
Adjusted Gross Income
$ 16,815.83 $ 9,622.39  $ 2,167.42  They reported the following business receipts and expenses on their Schedule Cs for the years at issue: Gross Income
1982
1983
1984
Construction Receipts  $ -         $ 8,251.88  $ 3,870.41 Other Receipts  27,703.00
13,500.00 - Less Construction Labor  -
(1,299.00)
(310.00)
Less Construction Materials  -
(5,602.06)
(540.20)
Total Gross Income    $ 27,703.00
$ 14,850.82 $ 3,020.21 Expenses
Depreciation on - Cattle & Breeding Contracts    $ 20,625.00
$ 20,850.00
[4] $ 20,675.00 - Other Items  -
2,015.60
[4] 2,015.00 Office Supplies  3,244.11
1,093.15
157.39 Other Deductions  8,118.42
2,420.34 715.50 Total Expenses    $ 31,987.53
$ 26,379.09 $ 23,562.89 Net Loss
$ 4,284.53 $ 11,528.27 $ 20,542.68 *469 The depreciation reported on the Schedule Cs consists of the following items: 1982
Date Placed
Recovery
Property
in Service
Cost
Period
Method
%
Amount
Cattle
12/81
$ 50,000
5 yr. ACRS
23
$ 11,500
Cattle
12/82
17,500
5 yr. ACRS
15
2,625
Breeding Contracts
12/82
32,500
5 yr. S/L
20
6,500
1982 Total      $ 20,625
1983
Date Placed
Recovery
Property
in Service
Cost
Period
Method
%
Amount
Unidentified
1/83
$ 2,293 3 yr. S/L
33
Unidentified
1/83
159
3 yr. S/O
33
$ 2,015 Unidentified
1/83
3,500
3 yr. S/L
33
Unidentified
12/83
92
3 yr. S/L
33
Cattle
12/81
50,000
5 yr. ACRS
21
10,500
Cattle
12/82
17,500
5 yr. ACRS
22
3,850
Breeding
Contracts  12/82
32,500
5 yr. S/L
20
6,500
1983 Total      $ 22,865
*470 [5] 1984
Date Placed
Recovery
Property
in Service
Cost
Period
Method
%
Amount
Unidentified
1/83
$ 2,293 3 yr. S/L
33
Unidentified
1/83
159
3 yr. S/L
33
$ 2.015 Unidentified
1/83
3,500
3 yr. S/L
33
Unidentified
12/83
92
3 yr. S/L
33
Cattle
12/81
50,000
5 yr. ACRS
21
10,500
Cattle
12/82
17,500
5 yr. ACRS
21
3,675
Breeding
Contracts  12/82
32,500
5 yr. S/L
20
6,500
1984 Total      $ 22,690
In 1982, petitioners claimed $ 1,286 of investment tax credit based on an investment of $ 17,500 in cattle. That amount reduced their joint Federal income tax liability to zero. Respondent audited petitioners' joint Federal income tax returns for the years at issue and made the following increases (decreases) to their reported income: Adjustment
1982
1983
1984
Depreciation
$ 20,625.00 $ 22,865.60
$ 22,690.00
Office Supplies
443.75 -
-
Married Couple Deduction
(46.40)
-
-
Construction Income
-
300.00
-
Construction Material
-
117.16
-
Total     $ 21,022.35 $ 23,282.76
$ 22,690.00
*471 Based on those adjustments, respondent determined that petitioners owed the following amounts of self-employment tax: 1982
1983
1984
$ 1,569.32
$ 1,099.04
$ 242.65
Respondent also determined: (1) that petitioners were not entitled to the investment tax credit that they claimed for 1982; (2) that additions to tax under sections 6653(a)(1), 6653(a)(2), 6651(a), and 6659 apply to each of the years at issue, and (3) that the underpayment of taxes for each of the years is subject to interest at a rate determined under section 6621(c). In their petition, petitioners asserted that they had overstated their income by $ 4,000 on their joint Federal income tax return for 1982. They subsequently failed to address this issue at trial or on brief. [6]
Respondent alleged on brief that petitioners maintained this proceeding primarily for delay and requested this Court therefore to award the United States $ 5,000 of damages under section *472 6673. OPINION A. Depreciation and Investment Tax Credit
The first issue for decision is whether petitioners are entitled to the depreciation and investment tax credit claimed on their returns for the years at issue. As is the case with all of the determinations made by respondent in his notice of deficiency, petitioners bear the burden of proving that respondent's disallowance of the depreciation and investment tax credit is incorrect. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In both 1983 and 1984, $ 2,015 of the depreciation that respondent disallowed was from four assets that petitioners failed to described on their returns. Petitioners have failed to identify what the assets were, prove their bases, or establish that the asses were used in a trade or business. We accordingly hold that petitioners have failed to prove that they are entitled to deduct their depreciation. See johnston v. Commissioner,T.C. Memo. 1988-43. The remainder of the depreciation, and all of the investment tax credit, claimed in each of the years at issue was for cattle that petitioners claim to have purchased and placed in service in December *473 of 1981 and 1982, and for breeding contracts for the cattle that petitioner claims to have purchased and placed in service in 1982. Respondent disallowed the depreciation deductions on the grounds that petitioners' cattle were not purchased for an activity engaged in for profit. Respondent additionally pointed out in his trial memorandum and on brief that petitioners are not entitled to depreciate the cattle and claim investment tax credit with respect to them unless they also establish an ownership interest in the cattle. It has long been recognized that the tax consequences of transactions are governed by substance rather than form. Gregory v. Helvering,293 U.S. 465 (1935); Commissioner v. Courts Holding Co.,324 U.S. 331, 334 (1945). Whether the purported cattle purchases by petitioners are, in substance, sales for Federal tax purposes is a question of fact. Leavy v. Commissioner,87 T.C. 56, 66 (1986). A transaction is a sale for tax purposes only if the benefits and burdens of ownership passed form the purported seller to the purported buyer. Grodt & McKay Realty Inc. v. Commissioner,77 T.C. 1221, 1236-1239 *474 (181). This Court has applied the following factors to determine whether a purported sale of cattle is to be recognized as transferring ownership for tax purposes: (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether the purported purchaser requires any equity in the property; (4) whether the contract creates a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the operation and sale of the property.
Cherin v. Commissioner,89 T.C. 986, 997 (1987); Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. After considering the facts of this case in light of the above factors, we are unconvinced that a sale took place for tax purposes.
1. Passage of Legal Title
We recognize at the outset that petitioner may have received titles to cattle when he purchased them through Friedl. As we have stated previously, however, "courts have repeatedly 'refused to permit the transfer of formal legal title to shift the *475 incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred.'" (DEmphasis added.) Cherin v. Commissioner, v. supra at 997 (quoting Frank Lyon Co. v. United States,435 U.S. 561, 572-573 (1978)). Considering the fact that the Gardners retained complete control over that petitioner purportedly purchased, we accord little weight to the factor of whether title to the cattle shifted to petitioner.
2. Whether Petitioner Acquired Equity in the Cattle
Petitioner acquired an equity in the cattle only if the unpaid balance of the contract price was less than their fair market value. Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Although the record does not establish the fair market value of the cattle when petitioner purchased them, three factors lead us to question whether their fair market value exceeded the amount that petitioner owed on them. First, petitioner made a down payment of only 10 percent of the contract price of the cattle. Payment of the remaining 90 percent of the *476 contract price was to be deferred for five years. Second, there is no evidence that petitioner took any legal action to enforce his contract to purchase the cattle. If he had an equity in them, we do not believe that he would have walked away from them as he did. Finally, we found as a fact that the cattle were worth less than the amount petitioner owed on them as of June 5, 1985. This finding establishes that petitioner had no equity in the cattle on that date, which was after he had made his 10-percent down payments on them.
3. Whether the Contract Creates a Present Obligation on Petitioner to Make Payments
Although the contracts petitioner signed purported to require him to make an immediate 10-percent down payment for the cattle and to pay the balance of the purchase price in five years, those obligations were illusory. The facts establish that the sellers loaned petitioner over $ 37,000, and that he used $ 5,000 of that amount to make his down payment on the first group of cattle. The balance of the loan was more than enough to cover any subsequent payments that petitioner made on the cattle. As it turns out, petitioner was never required to repay the loan as it *477 was canceled by his settlement agreement with the sellers. Any payments that petitioner made to the sellers were therefore, in effect, made with the sellers' own money. It appears doubtful to us that the parties contemplated that petitioner would pay the balances due on his contracts, which were not due for five years, as the management contracts that covered the cattle obligated the sellers to accept promissory notes from future investors as payment of the balances. These circumstances do not convince us that petitioner has a bona fide present obligation to make payments for the cattle.
4. Whether the Right of Possession Vested in Petitioner
Petitioner never had the right to possess the cattle. The management contracts provided specifically that "all animals will remain in the possession of Johnny Gardner and will be managed by him while any indebtedness remains." The facts do not establish that the cattle were ever fully paid for, and they in fact remained at all times in the possession of the sellers, who retained complete control over them.
5. Which Party Bore the Risk of Loss or Damage to the Property
The sales contract purported to shift the risk of *478 loss from the sellers. There is no evidence, however, that the sellers have attempted to enforce the contract and require the cattle to be paid for. In these circumstances, we are unconvinced that petitioner, in substance, bore the risk of loss of the cattle.
6. Which Party Receives Profits from the Operation and Sale of the Property
Although the management contracts provide that petitioner was entitled to part of the net proceeds from sales of calves born by the cattle, there is no evidence that he was actually paid any such profits. It insteada appears that the purported sellers retained any profits from the cattle.
7. How the Parties Treated the Transactions
Our analyses of the foregoing factors demonstrates that the parties have not treated the transactions as bona fide sales. As petitioner testified at trial, the purported sellers have elected to simply "walk away" from the transactions, and "pretend nothing had ever happened." It appears that the Gardners have retained the cattle as if they were their own. Despite the fact that petitioner purports to own the cattle, there is no evidence that he ever attempted to assert any ownership rights over them. *479 In sum, we conclude that the evidence fails to establish that the benefits and burdens of ownership of the cattle ever shifted from the Gardners to petitioners. It instead indicates that the benefits and burdens of ownership of the cattle remained at all times with the Gardners. We accordingly hold that petitioners have failed to prove that a purchase occurred for tax purposes. Cherin v. Commission, supra at 999. Petitioners are therefore not entitled to the depreciation and investment tax credit that they claim for the cattle and the breeding contracts. Zirker v. Commissioner,87 T.C.970, 975-978 (1986); Grodt & McKay Realty, Inc. v. Commissioner, supra at 1235-1243. B. Other Adjustments to Income
For 1982, respondent reduced petitioners' claimed deduction for office supplies by $ 443.75 from $ 3,244.11 to $ 2,800.36, and increased their married couple deduction by $ 46.40. For 1983, respondent increased petitioners' construction income by $ 300 and decreased their claimed deduction for construction material by $ 117.16 from $ 5,602.06 to $ 5,484.90. Although it is unclear whether petitioners contested these determinations in *480 their petition, or whether they were tried by the consent of the parties, it appears that petitioners no longer contest them. The determinations were not discussed in either petitioner's original or reply briefs, and we accordingly conclude that petitioners have conceded them. Rule 151(e); Strasser v. Commissioner,T.C. Memo. 1986-579 n. 13, affd. without published opinion 838 F.2d 1203 (2d Cir. 1987). Even if the determinations were still in dispute, we would hold that petitioners have failed to disprove them. They simply introduced no evidence that the determinations are in error. C. Self-Employment Tax
Respondent increased petitioner's self-employment income for even of the years at issue by the net of his adjustments to petitioner's Schedule C income, and increased petitioner's self-employment tax liability accordingly. Petitioners contested this aspect of respondent's determination in their petition. This matter appears to be a purely mechanical one resulting from respondent's other adjustments herein, which increased petitioner's Schedule C income. [7] As we have already addressed each of those adjustments and have concluded that petitioners *481 have failed to prove them to be in error, we accordingly hold that petitioners have failed to prove that they are not liable for the self-employment tax determined by respondent. D. Additions to Tax
Respondent determined in his notice of deficiency that petitioners are liable for the additions to tax provided by sections 6651(a), 6653(a)(1), 6653(a)(2), and 6659, and for the increased rate of interest provided by section 6621(c), for each of the years at issue. To avoid the additions, petitioners bear the burden of proving that respondent's determinations are incorrect. Welch v. Helvering, supra at 115; Rule 142(a).
Section 6651(a)(1)
Section 6651(a)(1) provides for an addition to tax for failure to timely file returns. Taxpayers can avoid the addition by establishing either that the return was timely filed or that it was filed late due to reasonable cause and not willful neglect. Sec. 301.6651-1(a)(1), Proced. & Admin. Regs. The facts establish that petitioners' joint Federal income tax returns for each of the years at issue were filed after the normal due date *482 for the returns. Petitioners introduced no evidence that they had obtained extensions of time in which to file the returns, or that they had reasonable cause for filing them late. In these circumstances, we hold that they have failed to prove that they are not liable for the addition to tax provided by section 6651(a)(1) for each of the years at issue.
Section 6653(a)
Sections 6653(a)(1) and 6653(a)(2) provide for additions to tax for negligence. Negligence under section 6653(a) is defined as lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). After considering all of the relevant evidence, including petitioner's central role in arranging the purported cattle sales and breeding contracts for which he claimed depreciation and investment tax credit and his failure to offer any evidence regarding the remainder of his deductions, we are unconvinced that he was not negligent in claiming the deductions that respondent disallowed. We accordingly hold that petitioners have failed to prove that they are not liable for the additions to tax under section *483 6653(a)(1) for each of the years at issue. We hold further that they have failed to disprove respondent's determination that the entire underpayment for each of the years at issue is attributable to negligence for purposes of the section 6653(a)(2) addition.
Section 6659
Section 6659 provides, as is relevant here, for an addition to tax on underpayments attributable to valuation overstatements. Section 6659(c) defines valuation overstatement to include, inter alia, the claim on a return of an adjusted basis of 150 percent or more of the correct adjusted basis. Respondent determined in his notice of deficiency that the portions of the underpayments for each of the years at issue due to the disallowed depreciation deductions were due to valuation overstatements. We agree. The bulk of the disallowed depreciation deductions were claimed by petitioners for the cattle and breeding contracts. As we found that no sale of those items took place, petitioners' "correct" adjusted basis in them is zero. Zirker v. Commissioner, supra at 978. The underpayments attributable to those items are therefore attributable to valuation overstatements and are subject to additions *484 to tax under section 6659 as determined by respondent. Zirker v. Commissioner, supra at 979. [8] As the valuation overstatement for the items exceeds 250 percent, the applicable percentage for the addition under section 6659 is 30 percent as respondent determined. Sec. 6659(b); Zirker v. Commissioner, supra at 979. The remainder of the depreciation that respondent disallowed was claimed for four unidentified assets. Petitioners introduced no evidence to support the adjusted bases they claimed for those assets. We accordingly conclude that they have failed to prove that the depreciation on those items was not due to a valuation overstatement, and hold that they have failed to disprove respondent's *485 determination that the underpayments due to those items are subject to a 30-percent addition to tax under section 6659.
Section 6621(c)
Section 6621(c) provides for a rate of interest on substantial underpayments attributable to tax motivated transactions of 120 percent of the underpayment rate established under section 6621. The rate applies to interest accruing after December 31, 1984, even if the tax motivated transaction occurred prior to that date. Solowiejzyk v. Commissioner,85 T.C. 552, 555-556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir.1986); sec. 301.6621-2T, Q-10 and A-10, Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50393 (Dec. 28, 1984). To be subject to the rate, the aggregate underpayment for a year attributable to all tax motivated transactions must exceed $ 1,000. Sec. 6621(c)(2). Tax motivated transactions include, inter alia, valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Respondent determined in his notice of deficiency that the portions of petitioners' underpayments for each year at issue that are attributable to their depreciation deductions *486 are subject to interest at the rate determined under section 6621(c). We have already concluded that petitioners have failed to prove that the disallowed depreciation was not due to a valuation overstatement. Respondent determined that the underpayments attributable to the depreciation deductions exceed $ 1,000 for each of the years at issue, and petitioners have not overcome that determination. We accordingly hold that petitioners have failed to prove that they are not subject to the rate of interest provided by section 6621(c) as respondent determined. E. Section 6673
Section 6673 provides that whenever it appears to this Court that a taxpayer has instituted or maintained a proceeding before us primarily for delay, or that the taxpayers position in the proceeding is frivolous or groundless, we shall award the United States damages not in excess of $ 5,000. Respodent asks us to award $ 5,000 damages to the United States. We have considered the record in this case and in our discretion decline to award damages in this proceeding. To reflect the foregoing, Decision will be entered for the damages requested under section 6673.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
*. 50 percent of the interest due on an underpayment of $ 9,096.32 ↩
**. 50 percent of the interest due on an underpayment of $ 6,426.04. ↩
***. 50 percent of the interest due on an underpayment of $ 3,328.65.↩
2. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750. ↩
3. Petitioners were before this Court previously in docket No. 2075-84. We addressed that case in Massengill v. Commissioner,T.C. Memo. 1986-159↩, and entered a decision pursuant to that opinion on July 7, 1986. That decision has subsequently become final. Respondent alleged in his amended answer that the doctrine of collateral estoppel applies to estop petitioners from relitigating a number of the facts found by this Court in its previous opinion. It appears that the parties have settled this matter as they have incorporated the bulk of those facts, with only minor variations, into their stipulation of facts for this case. We accordingly do not address the matter herein. 4. Petitioners provided no detail of the $ 22,690 of depreciation that they reported on their Schedule C for 1984. These amounts are based on the assets that they reported on their 1983 Schedule C and equal the depreciation that they would have claimed on those assets in 1984 using the basis and depreciation methods they used in 1983. ↩
5. See supra↩ n. 4. 6. In these circumstances, we consider the issue to have been abandoned by petitioners. Rule 151(e); Strasser v. Commissioner,T.C. Memo.1986-579 n. 13, affd. without published opinion 838 F.2d 1203↩ (2d Cir. 1987). 7. Petitioners have not raised any other issues regading this adjustment. ↩
8. We note that respondent did not determine, and has not argued, that the portion of the underpayment due to the disallowed investment tax credit was attributable to a valuation overstatement for purposes of the section 6659 addition. Cf. Zirker v. Commissioner,87 T.C. 970, 979↩ (1986) (holding portion of underpayment due to disallowed investment tax credit was due to valuation overstatement for purposes of sec. 6659 addition).