PRESTON W. AND JOYCE MASSENGILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Massengill v. Commissioner
Docket No. 2075-84.
United States Tax Court
T.C. Memo 1986-159; 1986 Tax Ct. Memo LEXIS 448; 51 T.C.M. (CCH) 888; T.C.M. (RIA) 86159; April 21, 1986. Preston W. and Joyce Massengill, pro se. John L. Hopkins, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6653(a)
1979
$3,455.72
$863.93
$412.70
1980
2,076.51
519.13
158.98
1981
1,925.00
481.45
233.00
*451 After concessions [2] by the parties, the issues remaining for our decision are as follows: (1) whether petitioners' cattle-breeding activity was an "activity not engaged in for profit" within the meaning of section 183(a); (2) whether petitioners are entitled to depreciation deductions in connection with this activity; (3) whether petitioners are entitled to investment tax credits for the cattle purchased; and (4) whether petitioners are liable for additions to tax under sections 6651(a)(1) and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and joint exhibits are incorporated herein by this reference. Petitioners Preston W. *452 and Joyce Massengill [3] were legal residents of Little Rock, Arkansas at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns (Forms 1040) for the taxable years 1979, 1980, and 1981 with the District Director, Little Rock, Arkansas on April 27, 1983. Petitioners later filed an amended return for 1979 on June 14, 1984, and an amended return for 1981 on October 31, 1983. Petitioner's individual Federal income tax returns for 1974 through 1976 were filed on November 1, 1979. [4] Petitioners' joint Federal income tax returns for 1977 and 1978 were filed on November 1, 1980. Petitioner did not have a college education. He did however take several years of college courses, including courses in math, physics, engineering, insurance, and business management. During the taxable years at issue petitioner was self-employed as a salesman. He sold prepackaged materials of family trusts as a representative of Educational Scientific Publishers, Inc., (ESP). The packages included information and *453 forms for establishing a living trust to which was transferred one's lifetime services in an attempt to shift the tax burden of one's income to the trust. The transferor would then arrange to receive income from the trust, e.g., for "consulting services" to the trust. See, e.g., Vercio v. Commissioner,73 T.C. 1246 (1980). These trusts have been denied tax effect by this and other courts. See Vercio v. Commissioner,supra.
Prior to petitioner's association with ESP, he was self-employed in 1974 as the proprietor of University Textbook Rental.Petitioner's net profit in 1974 was $21.37. In 1975, petitioner had a net loss of $3,953.56 from this same business. In 1976, petitioner was self-employed as a builder. His net loss from this business was $1,796.68. In 1977, his net loss was $4,880.23. In 1978, petitioner was self-employed as a management consultant with a net loss of $4,828.20. In 1981, petitioner sold a family trust package to one Estle Gardner (Estle), of Newark, Arkansas. After this purchase, Estle sought petitioner's advice in some of his personal financial affairs. Estle introduced petitioner to his son, Johnny. Johnny *454 and his wife, Nancy (the Gardners), raised cattle at Johnny Gardner Ranches. The Gardners were interested in a cattle-breeding technique called embryo transfer. The Gardners had no experience in embryo transfers but had utilized artificial insemination with their cattle. They had read about embryo transfers in several agricultural magazines. Embryo transfer is a process which has been developed in the last 20 years whereby fertilized embryo are transferred from a donor animal to a recipient animal so that the genetic characteristics of the donor animal can be utilized. For example, a cow that is viewed as genetically superior will be injected with drugs to make her super-ovulate, or produce a number of eggs. These eggs will then be removed either surgically or non-surgically (by a flushing process), and placed in a genetically inferior cow. The eggs are then fertilized by artificial insemination. Estle asked petitioner to visit Johnny's ranch, which he did in October, 1981. Petitioner was impressed with Johnny's knowledge of cattle-breeding.He made arrangements with Johnny to enter into an embryo transfer program, using Johnny's herd and ranch. Petitioner was to provide Johnny *455 with technical information about embryo transfers, or where to get such information. He was also to arrange a program for marketing the cattle that had been benefited by embryo transfers. It was understood that Johnny would need considerable capital to buy additional land and to pay for the embryo transfer program, which was quite expensive. Estle gave Johnny $75,000 for this purpose. Petitioner devised a plan to raise money from outside investors by selling the offspring from the recipient cows to investors at increased prices which the investors could then either sell or use to improve their own herds. [5]
*456 In December 1981, after his meeting with Johnny, petitioner convinced Robert F. Friedl (Friedl), to invest in the Gardners' embryo transfer project by purchasing 100 cattle from the Gardners. The cattle were purchased for $200,000. Friedl and petitioner executed an agreement which provided that 25 of these 100 cattle, or 25 percent of the herd, were purchased for petitioner. After the cattle were purchased, a management contract was executed between Friedl and the Gardners with petitioner signing as agent for the Gardners. This contract detailed the relationship and responsibilities of the Gardners as breeders utilizing Friedl's cattle in their embryo transfer project. [6] Petitioner paid Friedl $5,000 of his $50,000 share of the purchase price and agreed to pay the balance in five years with interest at 10 percent annually. Petitioner granted Friedl a lien on his interest in the cattle until he paid the balance of the purchase price. This lien was never recorded. At trial the only payments that had been made by petitioner were the original $5,000 and one interest payment of $4,500. *457 At about the same time Estle loaned $37,526.55 to petitioner at petitioner's request for the purpose of developing the embryo transfer program. Petitioner paid $5,000 of this money to Friedl to be used as the down payment for 25 of the 100 cattle Friedl was to purchase from the Gardners. An additional $15,000 of this money was loaned by petitioner to Generation Products Company (GPC). GPC was a corporation wholly-owned by Friedl and his wife, Sandra, that specialized in sports souvenirs. GPC then conveyed this $15,000 to Friedl's children [7] in return for the children's assumption of GPC's debt to petitioner. Friedl's children paid this $15,000 to Friedl in exchange for the stock of GPC. Friedl then used this $15,000 and the $5,000 paid to him by petitioner to make the 10 percent ($20,000), down payment on the cattle purchased from the Gardners. After the purchase of the cattle, petitioner went to Texas A&M University in College Station, Texas to meet with Dr. Morris, chief of Texas A&M's Animal Clinic. Dr. Morris was familiar with embryo *458 transfer and advised petitioner that embryo transfer was not a good investment for a farmer unless he had sufficient monies to do extensive research. Petitioner was not discouraged by Dr. Morris' comments but was instead motivated to be successful at something that others had not been. Dr. Morris expressed his willingness to fly to Kirksville to visit Johnny's farm and teach the Gardners about embryo transfer. Petitioner sought to have Dr. Morris teach the Gardners about embryo transfer but he himself did not make an effort to learn how to perform embryo transfer. His involvement in the embryo transfer project was to sell commercial cattle owned by the Gardners to individual investors who would leave the cattle with the Gardners to be utilized as part of the embryo transfer program. Embryos would then be sold to the investors and placed in these cattle. On July 18, 1982, a 10-year contract was executed between the Gardners and petitioner designating petitioner as the sales agent for Johnny Gardner Ranches in return for a 10 percent commission. One of the cattle petitioner purchased from Johnny was allegedly of a superior bloodline. This cow prompted petitioner to make his purchase. *459 At trial, evidence was introduced to show that this cow, plus six others, had died. Petitioner was unaware that the cattle had died. He had not seen the cattle since their original purchase. After the execution of the agency agreement between petitioner and the Gardners, the Gardners became discouraged about the prospect of making a profit in embryo transfer. They believed that the arrangement benefited those that had invested in their embryo transfer project but provided no benefit to them. Therefore, they refused to carry out petitioner's plan. At this point petitioner ceased making payments on the cattle he and Friedl had purchased from the Gardners. The Gardners then fired petitioner from his management contract with them and filed a lawsuit seeking the remainder of the payments owed to them by petitioner and Friedl for the cattle purchased. At trial, petitioner stated that the cattle were in the Gardners' possession and were now worth less than the balance owed on them. [8] Petitioner also stated that he had filed suit against the Gardners seeking termination of his agency contract. Petitioner has made no payments of principal or interest on the $37,526.55 loaned to *460 petitioner by the Gardners. The $37,526.55 loan was unsecured until October 1982 when petitioner secured the debt with a mortgage on his home. Mack Patton (Patton), testified for petitioner concerning the condition of the cattle located at the Gardners' ranch and the status of embryo transfer. Patton operated a business known as Patton Cattle Services, Inc. The business provided consulting and cattle management services to purebred cattle breeders. Patton had considerable expertise as a breeder and as a ranch manager. He had also served as the Director of Education and Research of the American Polled Hereford Association. Patton met Johnny in the fall of 1981 at a purebred cattle sale in western Tennessee. Johnny purchased some cattle at this sale, which was conducted by Patton. Patton later visited Johnny's ranch in the spring of 1982. Patton stated that Johnny had a "good herd" of about 106 registered [9] cattle most with a calf, and 125 commercial cattle. At the time of the trial the registered *461 cattle were probably worth between $125,000 and $150,000, according to Patton. This value was less than the original purchase price of the cattle, which Patton attributed to the fact that cattle prices were down 25 to 30 percent and that the cattle had suffered through several years of drought during which they did not conceive or reach full growth. In addition, several of Johnny's best cattle had died. In Patton's opinion an investor would have a very slim prospect of making a profit on embryo transfer due to the huge costs of carrying on such a project. Patton said that skilled individuals, usually surgeons, were required to remove fertilized eggs from a donor cow and place them in a recipient cow. The timing of the reproductive process of the donor and recipient cows had to be synchronized. Drugs must be administered to the recipient cow. Semen must be purchased with which to fertilize the eggs in the donor cow. Patton said the typical cost is usually $2,000 per calf. Patton said that he knew of no cases where a farmer performed his own embryo *462 transfers. In all the cases of which he had knowledge, outside technicians were brought in. While Patton believed that the Gardners were "good, honest, sincere, energetic, and enthusiastic cattle producers," he did not believe that they had the time, assistance, knowledge, skill, or finances to perform embryo transfers. Petitioner stated that his tax returns for 1979, 1980 and 1981 were untimely filed because his accountant neglected to complete the returns. He stated that the returns were complex due to his various business activities. Since he was uncertain about how to complete the returns he gave all of his tax information to an accountant, Jimmy Taylor (Taylor). Petitioner claimed Taylor later called him and told him to come pick up the materials and that he, Taylor, did not wish to complete the returns. Petitioner was then contacted by someone from the Internal Revenue Service ("the IRS"), who completed Schedule Cs to be used with petitioner's 1979 and 1980 returns. Petitioner then completed and filed the original returns for 1979, 1980, and 1981. Petitioners have claimed deductions for depreciation of $7,500 in 1981 under the accelerated cost recovery system. Petitioners *463 also claimed a $5,000 investment tax credit in 1981. Respondent disallowed these deductions and credits and determined additions to tax under sections 6651(a)(1) and 6653(a). [10]
OPINION Since the parties have stipulated the income, deductions *464 and credits allowable to petitioners for all three years here involved except for the deduction for depreciation and the investment credit based on petitioners purported investment of $50,000 in a herd of cattle in 1981, the only issues with respect to taxable income left for decision are whether petitioners are entitled to a deduction for depreciation and an investment credit for 1981. Accordingly, we must first determine whether petitioners possessed the requisite profit motive under section 183 to allow them to deduct depreciation incurred in connection with their investment in the cattle in 1981. [11]
Petitioners contend that they purchased an interest in the Gardners' cattle-breeding venture with the intent of making a profit. They argue that the "tax shelter regulations" are inapplicable to their situation of an individual making a purchase from another individual. In the alternative, they argue that if the regulations are applicable then their "write-offs" are not so excessive as to be disallowed. Petitioners further contend that the additions determined by respondent should not *465 be upheld. They claim that their returns were untimely due to the fact that their accountant delayed preparing them. They also contend that they cooperated fully with respondent's agents. Therefore, petitioners conclude that they did not negligently or intentionally disregard respondent's rules and regulations. Respondent takes the position that petitioners are not entitled to depreciation deductions or an investment tax credit for their cattle-breeding activity because the cattle-breeding investment was not an activity engaged in for profit. In addition, respondent contends that the transactions entered into by petitioners were sham transactions totally lacking in economic substance. Respondent further contends that petitioners' deductions are not allowable because petitioners were not at risk within the meaning of section 465. For these reasons, respondent concludes that his determination denying petitioners' deductions should be upheld. Section 183 provides generally that, except as otherwise provided for in that section, individual taxpayers will not be allowed a deduction for *466 activities that are "not engaged in for profit." An activity "not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Guidance as to what constitutes an activity that is engaged in for profit is provided in section 1.183-2(a), Income Tax Regs., which provides as follows: The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than *467 to the taxpayer's mere statement of his intent. Section 1.183-2(b), Income Tax Regs., provides several criteria for assisting in making such a determination, including the following: (1) Manner in which the taxpayer carries on the activity; (2) The expertise of the taxpayer or his advisors; (3) The time and effort expended by the taxpayer in carrying on the activity; (4) Expectation that assets used in the activity may appreciate in value; (5) The success of the taxpayer in carrying on other similar or dissimilar activities; (6) The taxpayer's history of income or losses with respect to the activity; (7) The amount of occasional profits, if any, which are earned; (8) The financial status of the taxpayer; and (9) Elements of personal pleasure or recreation in the activity. Our determination in this case will not depend on any particular factor or combination of factors but will involve a careful consideration of all the relevant facts and circumstances. *468 Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). Petitioner has the burden of proof to demonstrate that he entered into the cattle-breeding business with the actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). [12]
Initially we find it difficult to determine from petitioner's evidence and arguments just what part of the cattle-breeding program he was involved with and from whence he intended to make a profit. Nevertheless, after a careful examination of the facts and circumstances of this case, we find that petitioners' investment in the cattle did not gualify as an activity engaged in for profit within the meaning of section 183. While petitioner has stated that he entered into the cattle-breeding business with the intention of making a profit, and he signed various documents purportedly to establish this business, we must note that *469 "labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties." Houchins v. Commissioner,79 T.C. 570, 589 (1982). After reviewing the factors listed in the regulations, we find that petitioner's lack of expertise in embryo transfer, the minimal time and effort expended by him in carrying on this activity, and his prior history of losses in other business activities to be significant for our finding that the activity was not one engaged in for profit. Petitioner testified that when he bought an interest in the cattle he was not concerned with the embryo transfer program; he was just buying cattle to breed and sell the calves. However, he also testified that he knew nothing about cattle-breeding and, further, that without the embryo transfer program he could neither sell the cattle at a profit or utilize them in a plan to raise money from investors. He knew very little about embryo transfer and what he knew he learned from the Gardners. But the Gardners also knew very little about embryo transfer. They *470 did have a ranch on which they raised cattle and they had utilized artificial insemination with their herd. However, they did not have any training in embryo transfer and their knowledge about the procedure had been obtained from agricultural magazines. Petitioner stated that the Gardners had very little education and did not understand the technical aspects of running a business. Nevertheless, he left the implementation and operation of the program up to the Gardners. After purchasing his cattle from the Gardners, petitioner met with Dr. Morris who advised him that he would be unable to make a profit at embryo transfers. Patton also told petitioner that the huge expenses associated with embryo transfers would make it difficult to make a profit. Patton's testimony also indicates that the procedure of embryo transfer takes a highly skilled individual, usually a surgeon, and the procedure cannot be performed by a layman. Petitioner's contact with Dr. Morris and with Patton occurred after petitioner purchased his cattle. Prior to his purchase of the cattle and investment in the embryo transfer project, petitioner did not seek to learn about the economics or feasibility of embryo *471 transfer from anyone with this expertise. After purchasing his cattle, petitioner's involvement with the embryo transfer project was minimal. At trial he stated that he had not been to the Gardners' ranch since his original purchase of the cattle. Indeed, he was unaware that several of his cattle had died, including one allegedly superior cow that had been the impetus for his purchase. The evidence strongly suggests that while petitioner may have had some thoughts about using embryo transfers to breed a herd of superior cows to use in a tax shelter scheme, he abandoned that plan before it was started when he found out how expensive it would be. Clearly the cattle he and Friedl purchased in either late December or December 31, 1981, were never used in an activity engaged in for profit in 1981. Petitioner's employment indicates that he has a history of investing in businesses that result in losses. In 1975, petitioner had a net loss of $3,953.56 as the sole proprietor of University Textbook Rental. In 1976 and 1977, petitioner reported net losses of $1,796.68, and $4,880.23, respectively, from his business as a builder. In 1978, petitioner was self-employed as a management *472 consultant and reported a net loss of $4,828.20. Petitioner also has a history of involvement in tax avoidance schemes. Petitioner sold prepackaged materials for ESP. These materials contained forms and materials to establish a living trust. These trusts have been viewed by this Court as ineffective tax avoidance schemes. See Vercio v. Commissioner,supra.
Based upon the above discussion we find that petitioners did not purchase their cattle with the actual and honest objective of making a profit. Petitioner stated that he was aware after talking with Dr. Morris that embryo transfer was not economically feasible. However, he stated that this made the procedure more attractive to him from the standpoint of being successful at something that other ranchers had not. In light of petitioner's lack of expertise, his expenditure of very little time in the venture, his failure to investigate embryo transfer before he got involved in it, and his past history of business losses and involvement with other tax avoidance schemes, we are inclined to place more credence in the objective facts in this case, rather than in petitioner's statements of intent. [13] See *473 section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra, at 645. Accordingly, respondent's determination is sustained. Depreciation Deductions
We have determined that petitioners' investment in a cattle-breeding project was not an activity engaged in for profit within the meaning of section 183. We must now determine whether petitioners are to be allowed depreciation deductions on cattle purchased in connection with this activity. Section 167(a) provides a deduction for depreciation for (1) property used in a trade or business, or (2) property held for the production *474 of income. Section 183(b) provides that if an activity is not engaged in for profit there shall be allowed: (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). Depreciation would not be allowable under 183(b)(1) because we have found that petitioner's cattle-breeding activity was not engaged in for profit. Elliott v. Commissioner,84 T.C. 227, 243 (1985). Furthermore, petitioners reported no gross income from their cattle-breeding activity. Therefore, according to section 183(b)(2), no deduction for depreciation is allowable. Investment Tax Credit
The next issue is whether petitioners are entitled to an investment tax credit for the *475 cattle they purchased. Pursuant to sections 38 and 46, petitioners have claimed an investment tax credit for the cattle they purchased in the amount of 10 percent of their alleged basis of $50,000. Respondent contends that no investment tax credit should be allowed because petitioners were not "at risk" within the meaning of sections 465 and 46(c)(8). An investment tax credit is provided in section 38 for certain depreciable property, or, as it is often called, "section 38 property." "Section 38 property" is defined in section 48(a)(1) as follows: (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property (other than an air conditioning or heating unit), * * * Section 1.48-1(1), Income Tax Regs., provides that livestock is included as "section 38 property" and that the term livestock includes cattle. While the cattle at issue herein, at first blush, appear to qualify under *476 the statute and the regulations as "section 38 property" the flush language of section 48(a)(1) demonstrates otherwise. This language provides that: Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable * * * Also, section 1.48-1(a), Income Tax Regs., defines "section 38 property" as: property (1) with respect to which depreciation * * * is allowable to the taxpayer, (2) which has an estimated useful life of 3 years or more * * *, and which is either (i) tangible personal property * * *. Thus to qualify as section 38 property the cattle must be depreciable. Depreciation is allowable with respect to property used in a trade or business or held for the production of income. Section 167(a). Petitioners' losses, which were based on the depreciation of their cattle, were disallowed due to the *477 fact that they were not incurred in an activity that was engaged in for profit. In other words, the cattle were not used in a trade or business nor for the production of income. Therefore it follows that since petitioners' investment tax credits are not based upon property that was subject to depreciation they too must be disallowed. [14]
Additions to Tax
Respondent determined that petitioners were liable for additions to tax under section 6651(a)(1) for the taxable years 1979, 1980, and 1981. Section 6651(a)(1) provides for an addition to tax of up to 25 percent of the amount of tax required to be shown on the return for a failure to file a tax return "on the date prescribed therefor." The addition to tax does not apply if the failure is shown to be due to reasonable cause. The burden of proof with respect to this addition to tax *478 is upon petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners argue that their returns were untimely due to the inaction of their accountant. They contend that the failure to file their 1979, 1980, and 1981 returns until April 27, 1983, was not caused by any fault on their part. A taxpayer's duty to file a timely return and to pay tax is a non-delegable one. See, e.g., United States v. Boyle,469 U.S.    , 102 S. Ct. 687 (1985); Ferrando v. United States,245 F.2d 582 (9th Cir. 1957). Petitioners' evidence shows only that they gave their tax information to an accountant who failed to file the return.This is insufficient evidence for a finding that the failure to file was due to reasonable cause. We find that petitioners have failed to carry their burden of proof and therefore uphold the additions to tax under section 6651(a)(1). To hold otherwise would create a great potential for abuse by taxpayers who could avoid filing their tax returns by merely placing their records in the hands of a tax return preparer. *479 Respondent also determined an addition to tax under section 6653(a). Section 6653(a) provides for an addition to tax of five percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). Petitioners contend that their failure to pay was not due to negligence or intentional disregard of rules and regulations. They contend that their tax was not paid due to their accountant's failure to prepare the returns. As we noted above the duty to file a tax return and to pay tax is non-delegable. Petitioner stated that he was aware that the returns were late and that he should file them. The fact that petitioners' records were in the accountant's possession does not excuse petitioners from filing their returns and paying their tax. Therefore, we sustain respondent's determination of additions to tax under section 6653(a). To reflect concessions of the parties and the decision herein, *480 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties have resolved the issue of petitioners' Schedule C net profits or losses settling on an amount of $9,300.70 for 1979, $1,219.07 for 1980, and $1,962.27 for 1981. The 1981 total does not include any amount for depreciation deductions due to petitioners' cattle-breeding venture. In addition, the parties agree that petitioners are entitled to a Schedule E rental loss in 1979 of $3,381.22, and that petitioners had self-employment income in 1979 of $9,300.70.↩
3. All references to "petitioner" are meant to refer to Preston W. Massengill. ↩
4. These returns were filed by petitioner when he was single.↩
5. The evidence with respect to the details of the proposed program is very inadequate. Petitioner, who represented himself, was the only witness on the subject and his testimony was disorganized and disconnected. Neither of the Gardners was called as a witness. The above is our best "guesstimate" of how petitioner proposed to carry out the embryo transfer program, based on his testimony and some documentary evidence. It is not clear how or where petitioner was to fit into the program and profit thereby. Petitioner did later enter an agreement with Johnny to sell the improved cattle on a commission basis, and he did buy an undisclosed 25 percent interest in Friedl's herd, which will be discussed later, but we cannot be certain that this was a part of the original plan.↩
6. Petitioner stated that when these cattle were purchased he did not buy them as part of an investment program. He had no plan for the cattle when he bought them; he was just an individual purchasing cattle from another individual. He intended to later develop a plan for the cattle.↩
7. The Friedls had nine children: one of pre-school age, one in elementary school, three in high school, and four beyond high school.↩
8. Apparently neither petitioner nor Friedl personally undertook to sell the cattle in their herd or to use them in a breeding program after the embryo program was terminated.↩
9. To register a cow the owner was required to fill out an application form listing the cow's sire, dam, and date of birth.↩
10. On the 1979 return originally filed by petitioners, the Schedule C reported a net profit from the business of $17,470 but the net profit carried over to page one of the return was $8,893.35. Schedule C of the 1980 return reported net profit from the business in the amount of $2,031.01 but was carried over to page one as a net loss of $6,872.67. Schedule C of the 1981 return reported a net profit of $6.01 but was carried over to page one as a net loss of $5,557. The notice of deficiency used the figures reported on the Schedules Cs as profit from the business. Deductions for depreciation were not claimed on the returns nor allowed in the notice of deficiency. Petitioners did claim an investment credit in the amount of $5,000 on their 1981 return which respondent disallowed. In their petition filed herein petitioners claimed a deduction for depreciation of the cattle in the amount of $7,500.86, which respondent denied in his answer.↩
11. Qualification for the investment credit also depends on this, as discussed later.↩
12. See Faulkner v. Commissioner,T.C. Memo. 1985-536↩.
13. We think that petitioners' actual motive in investing in the Gardners' cattle-breeding venture was to avoid Federal income tax, perhaps at the Gardners' expense. Indeed, the money used by petitioners and Friedl to purchase their cattle came originally from the Gardners. The Gardners loaned $37,526.55 to petitioners. Twenty thousand dollars of this money passed through various hands but was eventually used to purchase cattle from the Gardners.↩
14. We also agree with respondent that petitioners were not "at risk" within the meaning of sections 465 and 46(c)(8) but do not elaborate upon this point since we have reached our decision, upholding respondent's determination, on other grounds.↩