**Preston W. and Joyce MASSENGILL, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 88–2738.

United States Court of Appeals, Eighth Circuit.

Submitted May 3, 1989.
Decided May 25, 1989.

Preston W. Massengill, pro se.

William S. Rose, Jr., and David I. Pincus, Washington, D.C., for appellee.

Before ARNOLD, BOWMAN, and MAGILL, Circuit Judges.

ARNOLD, Circuit Judge.

At issue in this appeal from the United States Tax Court[1] are appellant Preston Massengill's claimed depreciation deductions and investment tax credits based on his involvement in a cattle-breeding operation. The Tax Court held that Massengill's asserted purchases of cattle and his participation in breeding contracts had no economic substance, and should not be recognized for federal income tax purposes. *Massengill v. Commissioner,* 56 T.C.M. (CCH) 107 (1988). We affirm.

## I.

The case involves a complicated series of contracts to buy, breed, manage, and sell cattle. The participants agreed to share profits from a process by which ordinary cows were to bear superior calves after carrying the embryos transferred from a superior cow.[2] Apart from Massengill, the participants included Estle Gardner (Estle) and his son Johnny Gardner (Johnny), who are cattle ranchers, and Robert Friedl, an investor in the venture. Estle introduced Massengill to Johnny after Massengill sold Estle a "family trust" kit containing alleged information on avoiding income tax by transferring one's lifetime services to a living trust.

In 1981 Massengill and Johnny set up an embryo-transfer venture. They agreed that Johnny would manage and control the cows, and that Massengill would serve as Johnny's agent in soliciting investors. Johnny agreed to pay a ten per cent. commission to Massengill for this service. The men were to share profits from the sale of superior calves. Johnny had experience in the artificial insemination of cows, but not in the embryo-transfer process. Massen-

gill was to provide technical information. The men further agreed that investors in the operation would be allowed to pay off the notes they gave with notes from subsequent investors.

Massengill then borrowed more than $37,000 from Estle. Massengill gave Estle a note due in one year, with ten per cent. interest. This debt was later secured by a mortgage on Massengill's Little Rock, Arkansas, home.

In December 1981 Massengill convinced Friedl to buy 100 head of cattle from Johnny. Friedl agreed to pay Johnny $20,000 down on the $200,000 purchase price, and to sign a note due in five years for the remainder of the debt. Meanwhile, Friedl and Massengill struck their own deal, under which Massengill was to pay $50,000 for 25 of the cows Friedl was buying from Johnny. Massengill paid Friedl $5000 down on the 25 cows. This money came from the $37,000 Massengill had borrowed from Estle. Massengill gave Friedl a note for the remainder of the purchase price.

Massengill then lent $15,000 to a corporation controlled by Friedl.[3] This loan also came from the money Massengill had borrowed from Estle. Friedl used the $20,000 obtained from Massengill ($5000 down payment on the 25 cows and $15,000 loan) to make the down payment on the 100 cows from Johnny. Thus, all of the money given to Johnny as down payment on the cows came from Estle. Under the agreement between Friedl and Johnny, Johnny was to care for and breed the cattle. Massengill signed this agreement as Johnny's agent. Later, Massengill secretly (without telling the Gardners), arranged to buy 25 more cows from Friedl, again paying the ten per cent. ($5000) down and providing a note for the remainder.

In 1982 Massengill traveled to Texas A & M University to discuss the embryo-trans-

---

1. The Hon. Jules G. Korner, III, Judge.

2. The superior cows were to be induced to "super-ovulate," and the resulting eggs were to be artificially inseminated, then transferred to other cows. Appellee describes this embryo transfer process as "surrogate motherhood for cows." Appellee's Brief at 2.

3. The corporation gave the $15,000 to Friedl's children in exchange for their assumption of the debt to Massengill. The children then gave the money back to Friedl in exchange for stock in the corporation.

fer process with an expert in the field. Massengill was told that the process was not a good investment for a rancher without the resources to do extensive research.

Eventually, Estle and Johnny became discouraged about the venture. Estle dismissed Massengill from his position as agent for the cattle breeding operation, and demanded payment of the $37,000 loan. Estle also demanded an accounting for money Massengill had assertedly removed from a business account.[4]

In May 1984 Estle filed a complaint in an Arkansas state court, seeking to foreclose the mortgage on Massengill's home. Massengill filed a cross-complaint seeking unpaid commissions and damages for defamation and lost income. In settlement of the case, the parties agreed to cancel all debts owed to the Gardners and to Friedl. There was no mention of the cattle, which remained with Johnny.

Massengill and his wife claimed depreciation deductions and investment tax credits based on these transactions in the 1981 tax year, but these were disallowed by the Commissioner of Internal Revenue on the ground that Massengill's transactions were "activit[ies] not engaged in for profit," for which no deductions were available under 26 U.S.C. § 183.[5] *Massengill v. Commissioner*, 51 T.C.M. (CCH) 888 (1986).

For the tax years 1982, 1983, and 1984, the Massengills claimed depreciation deductions, for cattle purchases and breeding contracts, of $20,625, $20,850, and $20,675, respectively. The Commissioner disallowed these deductions and notified the Massengills of a deficiency for each of the tax years, again indicating that Massengill's activities were not for profit. The

Commissioner also made assessments as additions to tax under the following provisions: (1) section 6651(a)(1) (failure to file a timely return); (2) section 6653(a) (failure to file due to negligence); (3) section 6659 (overvaluation by 150% or more of the correct basis); (4) section 6621(c) (underpayment due to tax-motivated transactions).

In his answer to the Massengills' petition to the Tax Court, the Commissioner also maintained that the Massengills were not entitled to depreciate the cattle and to claim investment tax credit with respect to them because Massengill had failed to establish an ownership interest in the cattle. The Commissioner further raised collateral estoppel as a basis for denying the Massengills relief. The parties stipulated to facts found in the earlier Tax Court proceedings, however, and the court did not address the preclusion issue. Rather, the court focused on the circumstances surrounding the transactions, to determine whether the purchases should be recognized for tax purposes.[6]

The parties had not treated the transaction as a sale, the court noted, and Massengill had no right to possession of the cattle. Nor was there any indication that Massengill had acquired equity in the cattle. Under the circumstances, the court believed that Massengill had no real obligation to make payments for the cattle. Concluding that the benefits and burdens of ownership of the cattle remained at all times with the Gardners, the court held that the Massengills failed to show that a purchase occurred for tax purposes.

Additionally, the Tax Court upheld the additions to tax assessed by the IRS. The penalty under section 6651(a)(1) was appro-

---

**4.** Although the Tax Court made no finding on this point, it appears that Massengill used the money, allegedly commissions due him from Johnny, to pay interest to Friedl and to lend Friedl the money to pay interest to Johnny annually.

**5.** All references to the federal tax code are to the Internal Revenue Code of 1954, as amended and in effect at the time of these transactions.

**6.** The court considered (1) whether legal title passed; (2) how the parties treated the transac-

tion; (3) whether the purported purchaser acquired any equity in the property; (4) whether the contract created a present obligation on the purchaser to make payments; (5) whether the right of possession was vested in the purchaser; (6) which party bore the risk of loss or damage to the property; and (7) which party received the profits from the operation and the sale of the property. These factors were suggested in *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38 (1981).

priate, the court held, because the Massengills failed to file timely returns or to show that they had reasonable cause for filing late returns. The court found that the Massengills had not shown they were not negligent in claiming the deductions that were later disallowed; hence, the penalty under section 6653(a) was appropriate. The court upheld the penalty for valuation overstatement, under section 6659, reasoning that the Massengills' correct basis in the cows was zero because no sale had taken place. Finally, the court upheld the interest penalty for substantial underpayment attributable to a tax-motivated transaction, under section 6621(c). This timely appeal followed.[7]

## II.

■ Massengill principally argues that the Tax Court erred in assessing whether there was economic substance in his cattle purchase transactions. In support of this argument, Massengill points out (1) legal title to the cattle passed to the buyers in the venture under the terms of the contracts for sale; (2) price fluctuations are inherent in the nature of the cattle business, so that it was not significant that the cattle turned out to be worth less than he owed on them; (3) the contracts imposed an unequivocal duty to pay; and (4) no collusion was shown in the arrangement. The Commissioner responds that the Tax Court's evaluation of the facts underlying the case is not clearly erroneous.

The Commissioner is not required to recognize, for tax purposes, those transactions which lack economic substance. *E.g., Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). "The presence or absence of economic substance is determined by viewing the objective realities of the transaction, namely, whether what was actually done is what the parties to the transaction purported to do." *Killingsworth v. Commissioner,* 864 F.2d 1214, 1216 (5th Cir.1989). In assessing the true nature of Massengill's dealings, the Tax Court was called upon to "resolve whether, as a practical matter, those trans-

actions ha[d] any economic impact outside the creation of tax deductions." *Thompson v. Commissioner,* 631 F.2d 642, 646 (9th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). The court concluded the transactions had no such impact.

Because the Tax Court's conclusions are drawn "more from its experience 'with the mainsprings of human conduct' rather than the application of any legalistic formula," *id.* (quoting *Commissioner v. Duberstein,* 363 U.S. 278, 289–91, 80 S.Ct. 1190, 1198–99, 4 L.Ed.2d 1218 (1960)), this court's review is limited. The question of economic substance is essentially factual, and the Tax Court's finding is not to be disturbed unless clearly erroneous. *See F.P.P. Enters. v. United States,* 830 F.2d 114, 117 (8th Cir.1987) (district court finding that trust arrangement had no economic substance subject to clearly-erroneous review); 26 U.S.C. § 7482(a)(1) (court of appeals reviews Tax Court decisions in same manner as district court decisions).

The contractual declarations of intent and unequivocal obligation upon which Massengill relies do not dictate a decision in his favor. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) (mere expedient of drafting papers cannot overcome objective economic realities to contrary). Massengill has presented no convincing reason to reject the Tax Court's assessment of the essential nature of the transactions.

■ Next, Massengill argues that the Tax Court's finding that he had no ownership interest in the cattle means that he cannot be liable for valuation-overstatement penalties under section 6659, because the property was never placed into service. Massengill's reliance on *Todd v. Commissioner,* 89 T.C. 912, 913–14 (1987) (penalty inapplicable when deficiency was not due to overstated basis, but to failure to place property into service), *aff'd,* 862 F.2d 540 (5th Cir.1988), is misplaced. The taxpayer in *Todd* had acquired property. When an underpayment stems from disallowed de-

7. Joyce Massengill did not sign the notice of appeal.

preciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under section 6659. *Zirker v. Commissioner*, 87 T.C. 970, 979 (1986).

Finally, Massengill challenges the other penalties on the grounds that he actually purchased the cattle, failed through oversight to substantiate other deductions before the Tax Court, and exercised reasonable care in filling out tax forms. These arguments are unpersuasive.[8]

Affirmed.

---

**8.** Massengill has moved to strike the Commissioner's brief on the ground that it was filed one day late. In fact, the day scheduled for filing was February 20, 1989, the day on which Washington's Birthday was observed by law. The motion to strike is denied.