**In re William E. GRAN;**

**In re Shirley M. GRAN, Debtors.**

**William GRAN; Shirley M. Gran, Appellants,**

**v.**

**INTERNAL REVENUE SERVICE, United States of America, Appellee,**

**A.L. Tenney, Trustee.**

**No. 91–3150EA.**

United States Court of Appeals, Eighth Circuit.

Submitted April 16, 1992.

Decided May 21, 1992.

ing operation involving embryo transplants, was without economic significance and therefore a sham. The effect of that finding was to uphold the Internal Revenue Service's disallowance of the appellants' income tax deductions for depreciation and an investment credit on the cattle they purportedly purchased and owned. We affirm.

## I.

A. In late 1982, the appellants, William E. and Shirley M. Gran (the Grans), both Arkansas residents, at the suggestion of Warren Massingill, decided to "invest" in a cattle breeding operation. As this court explained in *Massengill v. Commissioner*, 876 F.2d 616 (8th Cir.1989), another tax case involving the identical operation, "[t]he participants agreed to share profits from a process by which ordinary cows were to bear superior calves after carrying the embryos transferred from a superior cow." *Id.* at 617. The breeding operation was to be conducted on a farm in Missouri managed by Johnny Gardner. Mr. Gran had known the Gardner family (although not Johnny Gardner) for many years and knew that the family had been cattle farmers for three generations.

Mr. Gran realized that the embryo transfer project was specialized and highly technical, that Gardner would be "among the very first" to do "an embryo transplant program such as this on a farm by themselves," and that Gardner could not do it without professional help. Gardner did not have the expertise or specialized facilities essential for an embryo transfer program.

The Grans' "investment" took the form of a sale to the Grans of sixty-five head of cattle (twenty-five "superior" cows and forty regular, recipient cows) and the execution of a management contract under which Johnny Gardner would retain possession of the cows and conduct the embryo transplant operations. Johnny Gardner's father gave the Grans a bill of sale covering the cows.

Joe Alfred Izen, Jr., Bellaire, Tex., argued, for appellants.

Sally J. Schornstheimer, Washington, D.C. argued (Gary R. Allen and Gary D. Gray, on the brief), for appellee.

Before ARNOLD, Chief Judge, FRIEDMAN,* Senior Circuit Judge, and LOKEN, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The principal issue in this appeal is whether the United States District Court for the Eastern District of Arkansas (Eisele, C.J.) correctly upheld, as not clearly erroneous, the Bankruptcy Court's finding that an alleged "investment" by the appellants in cattle to be used in a cattle breed-

---

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting    by designation.

The purchase price of the cows was $185,400, of which the Grans paid $18,500 to Massingill, who deposited the money in a bank account in the name of Johnny Gardner Ranches. The balance was due in five years. The Grans executed a promissory note for $185,400, payable to Johnny Gardner Ranches. Although interest was payable annually on the balance of the alleged indebtedness, the Grans never paid any. The Grans did not sign any documents giving Johnny Gardner a security interest in the cattle.

In the management contract, Gardner agreed to accept, as payments on the $185,400 promissory note of the Grans, five-year promissory notes from future investors in the venture and the Grans agreed to accept such notes as their share of any profits realized on the sale of calves produced in the cattle breeding operation.

Although Mr. Gran "had no way of knowing ... what cattle would cost" and did not have them appraised, he accepted the price as stated and did not negotiate or otherwise take part in determining the purchase price of the cattle. Expert testimony at the hearing before the bankruptcy court, discussed in Part II below, was that the value of the cattle at the time was less than their purchase price.

All twenty-five of the "superior" cows supposedly sold to the Grans were also sold to other investors in the program. The registration certificates listed Johnny Gardner Ranches as the owner of the cows, and the registrations were not changed to reflect the alleged new ownership.

The project turned out to be a fiasco. The Grans never filed suit to obtain the cows they purportedly owned and Gardner never attempted to collect from the Grans the balance of the $166,900 due on the promissory note. The Grans had no idea what happened to the cattle they supposedly purchased or where the cattle were.

B. In their joint federal income tax return for 1982, the Grans took a depreciation deduction of $18,200 and an investment tax credit of $1391, based upon the purchase price of the cows and the value of the management contract. The return showed that the Grans had an income of $52,275.37, but that they owed no tax, and they claimed a refund of $9,791.13. In their 1983 return, the Grans claimed a depreciation deduction based upon the program of $39,160. That return showed income of $54,716.99 and a $345 tax due, and claimed a refund of $8,158.66.

In July 1986, the IRS issued a deficiency notice for the tax years 1982 and 1983. It denied the deductions for depreciation and investment tax credits because it concluded that the embryo transfer program was a sham (i.e., that it lacked economic substance) and that, in any event, the Grans had not engaged in the project to make a profit. The IRS also assessed various penalties against the Grans.

The IRS assessed the taxes and penalties for 1982 in November 1986, and for 1983 in December 1986. It filed notices of tax liens covering the liabilities for both years in January 1987.

C. In July 1987, the Grans filed a petition under Chapter 13 of the Bankruptcy Act. The schedules filed with their repayment plan did not list Gardner as a creditor, and the Grans did not list the cattle as an asset. In October 1987, the IRS filed, on behalf of the United States, a proof of claim for debtors' federal income tax liability for 1982 and 1983 of $69,749.40, including tax, interest and penalties. The proof of claim also stated that notices of federal tax liens securing those liabilities had been filed in Pulaski County, Arkansas.

The Grans filed an objection to the proof of claim in December 1988, "disput[ing] the claims, stat[ing] that the claims include unsubstantiated charges for penalties and interest, [that] the taxes are overcalculated; and [that] the claims are barred by limitations."

Following a hearing, at which both the Grans and the United States presented expert testimony, the bankruptcy court overruled the Grans' objection to the United States' proof of claim. After discussing the evidence, the bankruptcy court concluded:

The evidence undoubtedly establishes that the purported sale of cattle to the debtors was a sham transaction engaged in solely for the purpose of creating fictitious tax deductions. Therefore, it is not necessary to consider the IRS's alternate argument that the debtors did not invest in the operation with the intention of making a profit.

The bankruptcy court rejected the Grans' contention that "their objection to the IRS claim should be sustained in any event because the IRS never came forward with evidence to sustain the validity of its claim in response to the debtors' objection." 108 B.R. 668.

On appeal, the district court affirmed, 131 B.R. 843. It held that the bankruptcy court's findings were not clearly erroneous; "[t]o the contrary, the court meticulously examined the evidence before it and weighed the credibility of the witnesses and experts presented in reaching its conclusion." The court also rejected the Grans' contention that the bankruptcy court erred by not classifying certain elements of the government's tax claims as "general, unsecured and non-priority," because the claims were secured as a result of the federal tax liens which arose and were filed prior to the bankruptcy petition.

The Grans moved for rehearing on the sole ground that the court had not addressed their second argument, *i.e.*, that the government was required to prove the amount of the taxes, interest, and penalties assessed, and the calculation of each amount. The district court denied rehearing, noting that the Grans challenged only the disallowance of deductions and investment tax credits claimed with respect to the cattle breeding program; "[t]hey did not challenge the calculation of the tax, penalties, interest, etc." The court rejected the argument that a challenge to one as-. pect of the proof of claim requires the government to prove each element of the claim.

## II.

"A transaction will not be given effect according to its form if that form does not coincide with the economic reality and is, in effect, a sham." *F.P.P. Enterprises v. United States*, 830 F.2d 114, 117 (8th Cir. 1987). " 'The presence or absence of economic substance is determined by viewing the objective realities of the transaction, namely, whether what was actually done is what the parties to the transaction purported to do.' " *Massengill*, 876 F.2d at 619 (quoting *Killingsworth v. Commissioner*, 864 F.2d 1214, 1216 (5th Cir.1989)).

█ In the present case, the bankruptcy court found that the evidence "establishes that the purported sale of cattle to the debtors was a sham transaction engaged in solely for the purpose of creating fictitious tax deductions." We agree with the district court that this finding is not clearly erroneous since, as that court stated, the bankruptcy court "meticulously examined the evidence before it and weighed the credibility of the witnesses and experts presented in reaching its conclusion."

1. Although the transaction took the form of a sale of 65 cows to the Grans for $185,400, the economic realities of the transaction were something else. The promissory note the Grans gave Gardner called for annual interest payments, which the Grans never made. Gardner was required to accept promissory notes from future investors as payments on the balance of the note. The Grans purchased the cattle without any inquiry into the fairness of the purchase price, and there was expert testimony that the value of the cows was significantly less than the amount the Grans purportedly paid for them. The Grans had no idea what happened to the cows they allegedly purchased or where they were. Twenty-five of the cows—the "superior" ones—also were sold to other investors in the project. Although the Grans received a bill of sale for the cattle, the registrations for the cattle in Gardner's name were not changed to reflect the new owners, as one would expect in a *bona fide* sale.

After the venture failed, the Grans made no attempt to obtain the sixty-five cows they allegedly owned, and Gardner made

no attempt to collect from the Grans on their promissory note. When the Grans filed their bankruptcy petition in July 1987, four and a half years after they made their purported purchase of the cows, they did not list the cows as an asset or the remaining $166,900 still allegedly due on the promissory note as a liability.

The total deductions for depreciation and investment credit the Grans claimed in their tax returns for 1982 and 1983, the years involved in this case, were $58,751. This was more than three times the Grans' total "investment" in the project of $18,500.

This and the other evidence discussed in Part I above fully supports the bankruptcy court's finding that "the purported sale of cattle to the debtors was a sham transaction engaged in solely for the purpose of creating fictitious tax deductions." Indeed, in an attachment to their bankruptcy petition, the Grans virtually admitted that the real purpose of their cattle "investment" was to obtain tax deductions. They stated that they "had invested in a farming operation (cattle, 1982)," but that "[s]ince the IRS has moved in and completely disallowed all tax benefits of said investment it has in effect ceased to exist." The conclusion is compelling that the Grans never intended to pay the balance of the purchase price and never regarded themselves as the owners of the cows. " '[A]s a practical matter,' " as in *Massengill*, the transaction had no " 'economic impact outside the creation of tax deductions.' " 876 F.2d at 619 (quoting *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981)).

*Massengill* involved the identical embryo cattle breeding operation as the present case. There, the Tax Court rejected Massingill's "claimed depreciation deductions and investment tax credits" because his "asserted purchases of cattle and his participation in breeding contracts had no economic substance, and should not be recognized for federal income tax purposes." 876 F.2d at 617. We held that the Tax Court's finding that the transactions in

which Massingill engaged had no economic substance was not clearly erroneous and that "Massingill has presented no convincing reason to reject the Tax Court's assessment of the essential nature of the transactions." *Id.* at 619.

Since the Grans were not parties to *Massengill*, that decision does not bind them. Our analysis and conclusions respecting the basic character of the cattle embryo breeding operations and the purported "investment" of the parties in the venture, however, are equally applicable here. They strongly support our conclusion in the present case that the bankruptcy court was fully justified in finding that the Grans' purported investment in and purchase of the cattle, like Massingill's similar transaction, was devoid of economic substance and therefore a sham, and was entered into solely to provide the Grans with deductions from their federal income taxes.

■ 2. The Grans contend, however, that the bankruptcy court improperly relied on the testimony of the government's expert witness, Daily, for its findings (1) that the cows were worth less than their purchase price and (2) that Gardner did not have the technical equipment or skill to conduct an embryo transplant and breeding operation. They assert that their expert witness, Patton, provided the only credible evidence on those issues.

Those two facts, however, were but two of the many grounds upon which the bankruptcy court based its finding that the transaction lacked economic substance and was a sham. In any event, the bankruptcy court was not required to reject the testimony of the government's expert witness and accept that of the Grans' expert.

The Grans' witness, Patton, an expert in cattle breeding and marketing, sold cattle to Gardner in 1981 and saw the cows on Gardner's ranch in the spring of 1982 and in 1985 or 1986. Patton described the embryo transfer process, stated that Gardner knew how to select cattle, and concluded that the prices of the cattle in 1982 were typical market prices.

The government's witness, Daily, an expert in animal husbandry, visited the John-

ny Gardner ranch in 1986. He found only fourteen of the cows that allegedly had been sold to the Grans in 1982; they all showed signs of poor nutrition and lack of good health management. Daily testified that cattle embryo transplantation is a complex process which requires substantial expertise and specialized, sterile facilities. He found none of the necessary equipment or facilities when he visited the Gardner farm in 1986, and also concluded that Gardner lacked the necessary knowledge and expertise to perform embryo transplants and explained his reasons for that conclusion.

After describing the method of calculating the value of cattle at a time prior to his inspection, Daily stated that the cattle were worth significantly less in 1982 than the price the Grans supposedly paid. He stated that the forty commercial grade cows (priced in the contract at $700.00 each) would have sold for between $350.00 and $400.00 each in 1982, and that the twenty-five superior cows (priced in the contract at between $600.00 and $25,000 each) would have sold for $750.00 each in 1982.

As the Grans recognize, the determination of the weight to be given expert testimony is a matter within the discretion of the trier of fact—here, the bankruptcy court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.1990). In upholding the bankruptcy court's determination, the district court pointed out that that court "weighed the credibility of the witnesses and experts presented." It is not our role to second guess the bankruptcy court's determination that the government's expert witness was credible. Although the Grans criticize Daily's "examination of the cattle operation over four years after the program began" as "so remote [in time] as to be inherently unreliable for the purpose of providing an opinion of value of cattle on the date the Grans entered their investment," that was only one factor for the bankruptcy court to consider in evaluating the evidence. The testimony Daily gave, summarized above, fully supports the bankruptcy court's determination that the selling prices of the cows were in excess of their market value and that Gardner did not have the necessary skill or technical competence to conduct the operation.

### III.

Under 11 U.S.C. § 502 (1988), a proof of claim filed in a bankruptcy proceeding is deemed allowed unless a party in interest objects. "Under Bankruptcy Rule 301(b), a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets." *In re Fidelity Holding Co.*, 837 F.2d 696, 698 (5th Cir.1988). "The objecting party must then produce evidence rebutting the claimant or else the claimant will prevail. If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to 'prove the validity of the claim by a preponderance of the evidence.'" *Id.* (citation omitted).

The Grans contend that they introduced evidence that rebutted the government's proof of claim by showing that the cattle transaction was a valid investment and had economic substance and that this evidence shifted to the government the burden "to prove each and every item of its deficiency and assessment contained in the Proof of Claim" "by a preponderance of the evidence."

The district court correctly rejected this contention in its order denying rehearing. As it stated:

Appellants' sole challenge to the proof of claim involved the disallowance of deductions claimed with respect to their investment in the embryo transfer program for tax years 1982 and 1983. They did not challenge the calculation of the tax, penalties, interest, etc.

    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

[I]t is debtors' task to challenge the claim on every ground available to them. When debtors do not put forward evidence that the proof of claim deviates from substantial conformity to official form the IRS need not address itself to that issue in its surrebuttal. Debtors may not interpose a single ground for objection and contend later that the IRS

has not met its burden as to form or content.

Case law fully supports that conclusion. When the taxpayer introduces evidence that refutes the government's proof of claim in a bankruptcy proceeding, any burden shifting to the government of coming forward with relevant evidence involves only those elements that the taxpayer has challenged. *See In re Smith*, 76 B.R. 426, 429–430 (Bankr.E.D.Pa.1987) (where debtors' objection and presentation at hearing appeared to accept creditor's basic entitlement to fees and disputed only amount thereof, debtors waived objection to entitlement issue); *In re Colonial Bakery, Inc.*, 108 B.R. 13, 15 (Bankr.D.R.I.1989) (creditor had burden of proving only amount of claim that debtor challenged; remaining $1,400 allowed because debtor introduced evidence challenging all but $1,400 of the claim). The same rule applies in a non-bankruptcy proceeding concerning a taxpayer's federal tax liability. *See e.g., United States v. Stonehill*, 702 F.2d 1288, 1294 (9th Cir.1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed.2d 761 (1984) ("Where an assessment is based on more than one item, the presumption of correctness attaches to each item. Proof that an item is in error destroys the presumption for that single item; the remaining items retain their presumption of correctness."); *Banks v. Commissioner*, 322 F.2d 530, 548 (8th Cir.1963) ("the taxpayer's burden of proof with respect to the presumption of correctness of the deficiency determination does not shift merely because there is some error in the Commissioner's statement").

The Grans' rebuttal evidence related only to the question whether the cattle transaction was a sham. The introduction of that evidence did not require the government to come forward with evidence relating to the penalties imposed, which the Grans' evidence did not challenge.

## IV.

Finally, the Grans contend that the bankruptcy court erred in not categorizing the government's various claims as priority or non-priority claims and request this court to "enter findings categorizing the various claims." They argue that certain portions of the government's claim should be categorized as "non-priority general unsecured claims."

■ The short answer is, as the district court pointed out, that the entire government tax claim is a secured one, as the result of the tax lien the government filed before the Grans filed their bankruptcy petition. Under 26 U.S.C. § 6321 (1988), the United States has a lien "upon all property and rights to property, whether real or personal, belonging to" "any person" who has failed to pay any tax on demand, for the "amount [of such tax] (including any interest, additional amount, addition to tax, or assessable penalty)." The § 6321 tax lien "reach[es] every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985).

■ Since only unsecured claims are categorized as priority or non-priority, *see* 11 U.S.C., §§ 506 & 507 (1988 & Supp. II 1990), any attempt now to characterize any portion of the government's claim as priority or non-priority would be premature. That question would arise only if it should develop that the property of the Grans to which the government's tax lien attached, is insufficient to satisfy the government's tax claim.

Indeed, the bankruptcy court apparently recognized this in denying the Grans' motion to alter or amend the judgment to characterize the government's tax claims. It stated that such action was "without prejudice to the right of the debtors to propose an amended plan dealing with non-priority tax claims and without prejudice to the government to object to same." The bankruptcy court thus properly deferred any decision characterizing the government's claims until it was necessary to do so.

Moreover, in its brief, the government states that "to the extent, if any, that it is ultimately determined the government's claim exceeds the value of the estate's

property, the Government agrees with debtors that certain elements of the claim (the tax, penalty, and interest for tax year 1982; and the penalty portion of the 1983 tax and interest on the penalty) are not entitled to priority status." If the government's tax lien does not cover any portion of the government's tax claim, the government agrees with the Grans that those portions of the claims are non-priority claims.

## V.

The bankruptcy court, following *California State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fidelity Holding Co.)*, 837 F.2d 696 (5th Cir. 1988), held that once the Grans refuted the prima facie effect of the government's proof of claim, the burden shifted to the government to produce additional evidence to prove its tax claim by a preponderance of the evidence. The court then stated:

> The debtors produced evidence concerning the preparation of their 1982 and 1983 personal income tax returns and the basis for the claimed deductions, and then rested. The IRS went forward and introduced evidence which rebutted the correctness of the deductions claimed by the debtors. Notwithstanding the argument by the IRS that the debtors had the burden of proof, the IRS established by convincing evidence that its claim was proper and that the debtors' objection was not credible and was without merit.

The government urges us to reject the bankruptcy court's ruling on the burden of proof and to hold that in bankruptcy the bankrupt has the burden of proving entitlement to the deductions and credits claimed on his federal tax return. We decline to reach that issue, however, in view of the bankruptcy court's ruling that the government established the validity of its claim by convincing evidence. The question whether the burden of proof is on the government or on the bankrupt thus is wholly academic in this case, and there is no occasion for us to decide it.

The judgment of the district court is affirmed.