HENRY E. AND DOROTHY ENGLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Engler v. Commissioner
Docket No. 39538-87
United States Tax Court
T.C. Memo 1995-338; 1995 Tax Ct. Memo LEXIS 342; 70 T.C.M. (CCH) 172; July 26, 1995, Filed *342 Decision will be entered for respondent except as to the additions to tax for negligence. For petitioners: Gino Pulito. For respondent: John Aletta. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b) and Rules 180 et seq. [1]
Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for the taxable years 1980 and 1983 as follows: Additions to Tax Sec.
Sec.
Sec.
Sec. Sec. Year
Deficiency
6653(a) 6653(a)(1)
6653(a)(2)
6659(a)
6661(a) 1980
$ 2,730.00
$ 136.50
--  --
$ 819
--     1983
11,589.20
--   $ 579.46
[1] $ 2,256
[2] $ 1,017.30
*343 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c), formerly section 6621(d), for each of the taxable years in issue. Petitioners have conceded the deficiencies in income taxes. Accordingly, the only issues for decision are whether petitioners are liable for: (1) Additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (2) additions to tax for a valuation overstatement under section 6659(a); (3) an addition to tax for a substantial understatement of income tax for the taxable year 1983; and (4) the increased rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. At the time that the petition was filed, petitioners resided in Elyria, Ohio. Petitioner Henry E. Engler (petitioner) is a high school graduate who has taken some college courses dealing mainly with job-related subjects. Mrs. Engler is also a high school graduate. During the years in issue, petitioner was employed as a supervisory air traffic control specialist at the Cleveland Air Traffic Control Center. During the years in issue, Mrs. Engler was a housewife. Petitioners *344 have no specialized training in either accounting or taxation. In 1982 or early 1983, petitioner began considering ways by which to ensure his family's financial security upon his retirement. Petitioner considered various investment options, including the possibility of investing in stocks and bonds. He spoke with several brokers and attended a few seminars in an effort to educate himself on the topic. Petitioner also spoke with his colleagues about his financial concerns. Some of petitioner's colleagues suggested that he consult with Graham & Associates, Inc. (Graham & Associates) regarding long-term investment packages. Prior to 1983, petitioners had made no financial investments. Petitioner met with John Hootman (Hootman) and John Graham of Graham & Associates for the first time on July 26, 1983 (the first meeting). Thomas Graham (Graham), the president of Graham & Associates, was not present at the first meeting. Petitioner's purpose in attending the first meeting was to find out "what all these financial investments was all about and how they operated and what they were offering". Petitioner was impressed by the operations of Graham & Associates, by the apparent professionalism *345 of the staff, and by Graham's credentials. At the first meeting, petitioner was advised that some of the investments [2] offered by Graham & Associates were tax shelters. In subsequent meetings with petitioners, Graham outlined a long-term investment strategy for petitioners. This long-term strategy included several investments, including Saxon Energy Corp. (Saxon). Petitioners first learned of Saxon through Graham & Associates. Saxon was a corporation formed in 1981 to lease energy management systems to the public. See Schillinger v. Commissioner, T.C. Memo. 1990-640, affd. per order 1 F.3d 954 (9th Cir. 1993) (discussing the Saxon Energy program in some detail). Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the years in issue. Petitioner was, however, *346 aware of what he described as "a frenzy all across the country initiated by the United States Congress and the Executive Department to save energy". Graham & Associates provided petitioners with several documents relating to Saxon, including a copy of the Saxon Energy Corp. Energy Brain/Fuel Optimiser Equipment Leasing Program Information Memorandum (the Information Memorandum); a document entitled "Frequently Asked Questions About the Energy Brain/Fuel Optimiser Equipment Leasing Program", and a copy of a document entitled "Fair Market Value of Equipment $ 205,000". These documents contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of leasing such a system. Petitioners also received from Graham & Associates a copy of a 1-1/2 page letter from Charles Taylor (Taylor) to Saxon indicating Taylor's opinion that the fair market value of the Energy Brain System was $ 205,000. The letter, dated June 13, 1983, included a "vita criteria" providing limited information regarding Taylor's credentials. Prior to investing in Saxon, petitioners reviewed each of the documents *347 provided to them by Graham & Associates. After the first meeting, petitioner also took other steps in an effort to decide whether to engage Graham & Associates as his financial adviser. First, petitioner investigated whether Graham & Associates was a legitimate company. He telephoned the Better Business Bureau in Cleveland to inquire whether it had collected any negative information regarding Graham & Associates. Petitioner was advised that no negative information had been recorded. Petitioner posed similar questions regarding Graham & Associates to the Securities and Exchange Commission in Washington, D.C., and was similarly advised that no negative information regarding Graham & Associates had been recorded. Next, petitioner attempted to determine whether the advice he had received from Graham & Associates was reliable. Petitioner telephoned the Internal Revenue Service (IRS), asked for a tax shelter specialist, explained the Saxon Energy program, and elicited the IRS representative's views on the legality of the program. Petitioner understood the IRS representative to indicate that the program did not violate any tax laws. Petitioner also contacted the accountant who had prepared *348 his income tax returns for prior years and a tax attorney in Elyria. He explained the Saxon Energy program to each of these professionals and asked whether the program was legal from a tax standpoint. He understood both professionals to reply in the affirmative. After petitioner was satisfied that he could rely on the advice of Graham & Associates, he engaged that firm as his financial adviser. On December 13, 1983, petitioner completed a document entitled "Lessee's Qualification Questionnaire". On that same date, Graham completed a document entitled "Business Advisor's Questionnaire", which was countersigned by petitioners. An Agreement of Lease (the lease) was entered into on December 13, 1983, between petitioners as lessees and Saxon as lessor, for a one-half interest in an Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), an energy management device. The term of the lease was 20 years. A Certificate of Insurance for the Energy Brain System named Saxon as the insured. The policy expiration date was December 1, 1984. Under the terms of the lease, petitioners were required to pay, and did in fact pay, an advanced guaranteed rental for the period December 31, 1983 *349 through December 31, 1984 in the amount of $ 6,750 for their one-half interest in the Energy Brain System. Petitioners did not negotiate the amount of the lease payment to Saxon. After petitioners made this payment, they and a Saxon representative executed an Election to Pass Investment Tax Credits from Lessor to Lessee. Petitioners never intended to use the Energy Brain System themselves. Instead, petitioners planned to engage a management company, which would locate an end-user. The end-user would pay for the Energy Brain System by sharing equally the amount of energy savings with the lessees. The management company was to retain a fee of 15 percent of petitioners' share of the energy savings and remit the balance to petitioners. Petitioners were then required to pay Saxon 75 percent of the remaining net income. Petitioners relied upon Graham & Associates to select ALH Energy Management Corp. (ALH) as the management company for the Energy Brain System. Petitioners received a letter dated December 22, 1983, from ALH indicating that petitioners had expressed an interest in utilizing ALH as the management company for the Energy Brain System. Enclosed with the letter from ALH were *350 two copies of ALH's standard form of management agreement, which petitioners were instructed to sign and return with a check in the amount of $ 675. Petitioners executed a Service Agreement with ALH, but that agreement, dated December 13, 1983, was not signed on behalf of ALH. A Management Agreement between petitioners and ALH was also drafted. That Management Agreement, also dated December 13, 1983, was neither signed by ALH nor by petitioners. By check dated December 13, 1983, petitioners paid ALH $ 337.50 (one-half of the $ 675 requested by ALH). By letter dated June 28, 1984, K. M. Fereg (Fereg) of ALH notified petitioners that the Energy Brain System had been placed in service in December 1983. The location of the Energy Brain System was identified in that letter as Sawa's Old Warsaw Restaurant at 9200 West Cermak Road in Broadview, Illinois. On February 12, 1985, petitioners wrote to Fereg, enclosing a check for $ 150 to pay for continued insurance of the Energy Brain System. In that letter, petitioners also requested that ALH provide them with "a financial report as to the status of the installation and operation of the system and the gross receipts derived therefrom". This *351 check was returned by Fereg to petitioners, with an accompanying letter dated May 14, 1984. The letter indicated that ALH had been unable to obtain a group insurance policy covering the Energy Brain System and that petitioners should attempt to obtain coverage privately. Between February 22, 1985 and October 1985 petitioners received several pieces of correspondence from Graham & Associates relating to the IRS examination of Saxon and those who had invested in the investments that Saxon promoted. These letters also assured petitioners of the continued viability of their investment. On several occasions, petitioner spoke with Graham, who assured him that Graham & Associates was managing the Energy Brain System, ensuring that such systems were installed and operating properly. Susan Haselhorst (Ms. Haselhorst) is an expert in the fields of energy management systems, design engineering evaluation methods, and energy system modeling. She prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Study). The preparation of the Study took 120 hours and utilized four experts who hold degrees in *352 areas such as engineering and accounting. The cost of conducting the Study was approximately $ 15,000. In evaluating the fair market value and the profit potential of the Energy Brain System, Ms. Haselhorst considered, among other things, the Information Memorandum and other promotional literature, the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogues and magazines. She also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Study, Ms. Haselhorst concluded that the fair market value of the Energy Brain System did not exceed $ 795. She also concluded, on the basis of the Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. Petitioners do not dispute these conclusions. We think the conclusions are supportable and adopt them as our own. See Schillinger v. Commissioner, T.C. Memo. 1990-640. During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed because of the nation's energy conservation *353 needs. Energy management systems were available at the retail level for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and other monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980 and 1983. On Form 3468 (Computation of Investment Credit) attached to their 1983 income tax return, petitioners claimed a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, they claimed an investment credit of $ 10,250. [3]
*354 Petitioners also attached a Schedule C in respect of their Saxon investment to their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 6,750. Petitioners reported no gross receipts or sales in respect of the Saxon investment on the Schedule C. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed an investment credit carryback pertaining to their Saxon investment to the taxable year 1980 in the amount of $ 2,730. As previously indicated, petitioners concede the deficiencies in income tax for the years in issue. We need therefore only decide whether petitioners are liable for: (1) Additions to tax for negligence; (2) additions to tax for a valuation overstatement; (3) an addition to tax for a substantial understatement of income tax for 1983; and (4) the increased rate of interest under section 6621(c). OPINION Petitioners bear the burden of proof as to each of the additions to tax and as to the increased rate of interest. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Negligence
We begin with the addition to tax for negligence, *355 which is the primary issue in this case. Section 6653(a) for 1980 and section 6653(a)(1) for 1983 impose an addition to tax in the amount of 5 percent of the underpayment if any portion of the underpayment is due to negligence or intentional disregard of the rules or regulations. For 1983, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Within this framework, petitioners may prevail if they reasonably relied on competent professional advice. Freytag v. Commissioner, 501 U.S. 868 (1991). When considering *356 the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment. In this case, petitioners contend that their actions, particularly their reliance on Graham & Associates, were reasonable, pointing in particular to their advance inquiries concerning: (1) Alternative investment opportunities; (2) Graham & Associates; and (3) the legality of tax shelters. Petitioner's testimony at trial was credible and provides the evidentiary basis for our conclusion that petitioners are not liable for the additions to tax for negligence. Neither petitioner received an educational degree beyond the high school level nor did either have any investment experience prior to 1983. By investigating alternative forms of investments, by attending seminars, by meeting with several brokers, by consulting with his colleagues, by meeting with representatives of Graham & Associates on several occasions in order to discuss his financial situation and potential investments, and by reviewing the information provided to him by Graham & Associates, petitioner made a good faith effort *357 to identify a long-term investment that would provide his family with an increased level of financial security. By consulting a tax shelter specialist at the IRS, by consulting an accountant who had previously prepared his income tax returns, and by consulting a tax attorney, petitioner made a good faith effort to ascertain whether the type of investment being proposed by Graham & Associates was an appropriate type to be considered. By telephoning the local office of the Better Business Bureau and the Securities and Exchange Commission in Washington, D.C., petitioner also made a good faith effort to ensure that the financial adviser he selected could be relied upon. Petitioners subjectively intended to achieve an economic profit from their investment. Aware of the increasing governmental interest in energy conservation, petitioner subjectively believed that the Energy Brain System had, as indicated by Graham & Associates, the potential to produce an economic profit. Petitioners attempted to monitor their investment, both by contacting ALH and by maintaining continued contact with Graham & Associates. Although slightly more sophisticated investors would likely have taken steps *358 different from those taken by petitioners to ensure the viability of an investment upon which they intended to earn an economic profit, we are persuaded that petitioners' actions with regard to the Energy Brain System, under the specific facts and circumstances presented in this case, were reasonable. Therefore, we do not sustain respondent's determination with respect to the additions to tax for negligence. Overvaluation
We turn now to the additions to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Sec. 6659(b). Section 6659 does not apply, however, to underpayments of tax that are not attributable to valuation *359 overstatements. Sec. 6659(a); Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987). On their 1983 income tax return, petitioners claimed a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment tax credit of $ 10,250 and utilized $ 9,030 of that amount to reduce their reported income tax liability for 1983 (exclusive of the alternative minimum tax) to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 6,750. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed an investment credit carryback pertaining to their Saxon investment to the taxable year 1980 in the amount of $ 2,730. On the basis of the Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. We must now decide whether the deficiency in income tax for each of the taxable years in issue is attributable to *360 such overstatement. See, e.g., Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427; Urbanski v. Commissioner, T.C. Memo. 1994-384. [4]
In this instance, the deficiency determined by respondent for 1980 resulted from the disallowed carryback of investment credit from 1983 pertaining to petitioners' Saxon investment. Accordingly, we sustain respondent's application of the addition to tax under section 6659(a) to the *361 entire underpayment for the taxable year 1980. We also sustain respondent's determination with respect to that part of the underpayment for the taxable year 1983 that is attributable to the valuation overstatement, specifically the amount relating to the investment tax credit. Because petitioners reported and paid alternative minimum tax due on their original 1983 income tax return, the amount attributable to the valuation overstatement in 1983 is $ 7,520 rather than $ 9,030. Understatement of Tax Liability
We turn next to the addition to tax for substantial understatement of income tax under section 6661(a) for 1983. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount attributable to a substantial understatement. [5] *362 An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). [6]
In determining the amount of the addition to tax for which taxpayers are liable, section 6661(b)(3) provides: "there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659". "The portion of the understatement on which the penalty under section 6659 has been imposed is taken into account, however, in determining whether there is a substantial understatement of tax." Sec. 1.6661-2(f)(1), (2), Income Tax Regs. (emphasis added). Because the understatement for 1983, which petitioners have conceded, exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000, the addition to tax under section 6661(a) applies. Sec. 6661(b)(1)(A). We therefore sustain respondent's determination that *363 the addition to tax under section 6661(a) applies to that portion of the understatement not subject to the addition to tax under section 6659, i.e., $ 4,069 ($ 11,589 - $ 7,520). Increased Rate of Interest
Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to 1 or more tax-motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988)(the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before the date of enactment of section 6621(c)). Respondent determined that petitioner was liable for the increased rate of interest because the underpayments for the years in issue are attributable to a tax-motivated transaction. Section 6621(c)(3)(A)(i) provides that the term tax-motivated transaction includes "any valuation overstatement (within the meaning of section 6659(c))". Accordingly, *364 in light of our conclusion that a valuation overstatement exists for 1980 and 1983, we are bound to sustain respondent's determination under section 6621(c) with respect to the deficiency in each of those years that relates to the valuation overstatement. In addition, section 6621(c)(3)(A)(v) provides that the term tax-motivated transaction includes "any sham or fraudulent transaction". Economic shams, or transactions which lack economic substance, fall within the ambit of section 6621(c)(3)(A)(v). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). The presence of a subjective profit motive does not preclude the conclusion that a transaction lacks economic substance and is therefore, a sham. Cherin v. Commissioner, 89 T.C. 986 (1987). *365 Petitioners introduced no evidence that the Saxon transaction was not an economic sham. Accordingly, we sustain respondent's determination that petitioners are liable for the increased rate of interest under section 6621(c) with respect to the deficiencies for both of the years in issue. Conclusion
In order to reflect our disposition of the disputed issues, as well as petitioners' concessions, Decision will be entered for respondent except as to the additions to tax for negligence. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence, i.e., $ 11,589.20.↩
2. Respondent amended her answer to plead, in the alternative, that in the event that the Court concludes that the addition to tax under section 6659 does not apply, the addition to tax under section 6661 should be increased to $ 2,897.30, or 25 percent of the entire deficiency, rather than 25 percent of the portion of the deficiency not attributable to an overvaluation of property.↩
2. We use the term "invest" and all of its derivatives solely for the sake of convenience.↩
3. Of this amount, petitioners utilized $ 9,030 on their 1983 return in order to reduce their reported income tax liability for that year (exclusive of the alternative minimum tax) to zero.↩
4. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980) is "attributable to" the adjustments in the later year, sec. 6659 may be applied to taxable years prior to 1981. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
5. Having concluded that petitioners are subject to the addition to tax for a valuation overstatement under sec. 6659(a), we need not address respondent's alternative argument, advanced in her amended answer, that sec. 6661(a) should apply to the entire deficiency for 1983.↩
6. An understatement will be reduced to the extent that it is: (1) Based on substantial authority or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In this case, the understatement for 1983 was neither based upon substantial authority nor adequately disclosed.↩