RODNEY R. AND LOUISE R. MAMINGA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Maminga v. Commissioner
Docket No. 16426-88
United States Tax Court
T.C. Memo 1995-361; 1995 Tax Ct. Memo LEXIS 361; 70 T.C.M. (CCH) 277; August 2, 1995, Filed *361 Decision will be entered under Rule 155. For petitioners: Gino Pulito. For respondent: John Aletta. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) and Rules 180 et seq. [1]
Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for taxable years 1980, 1981, 1983, and 1984 as follows: Additions to Tax
Sec.
Sec.
Sec.
6653
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
(a)(2)
6659(a)
6661(a)
1980
$ 12,747.00
$ 637.35
--  --
$ 3,824.10
--  1981
7,451.00
--  $ 372.55
[1] 2,235.30
--  1983
5,416.00
--  270.80
[1] 894.90
[2] $ 608.25
1984
4,501.00
--  225.05
[1] --  --  *362 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c), formerly section 6621(d), for each of the taxable years in issue. In this regard, respondent further determined that for each taxable year, except for the taxable year 1984, the underpayment of income tax attributable to tax-motivated transactions coincides with the deficiency in income tax. For 1984, respondent determined that the underpayment of income tax attributable to tax-motivated transactions amounts to $ 3,349. Finally, for the taxable year 1984 respondent also determined a deficiency in petitioners' excise tax under section 4973 for excess contributions to an individual retirement account in the amount of $ 120. By a Stipulation of Settled Issues previously filed with the Court, the parties have settled all issues related to the taxable year 1984, including the carryback of investment credit from that year to 1981. By such stipulation the parties have also settled the additions to tax and the increased rate of interest for 1981 insofar as such additions and interest relate to such carryback. The issues for decision that remain in this case relate to the taxable *363 years 1980, 1981, and 1983. Petitioners have conceded the deficiencies in income taxes for those years. Accordingly, the only issues that we must decide are whether petitioners are liable for: (1) Additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (2) additions to tax for a valuation overstatement under section 6659(a); (3) an addition to tax for a substantial understatement of income tax under section 6661(a) for the taxable year 1983; and (4) the increased rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. At the time that the petition was filed, petitioners resided in Elyria, Ohio. Petitioner Rodney R. Maminga (petitioner) and petitioner Louise R. Maminga (Mrs. Maminga) are both high school graduates. During the years in issue, petitioner was employed as a supervisor in an air traffic control center, and Mrs. Maminga was a housewife. Petitioners have no specialized training in either accounting or taxation, although petitioner sometimes prepared their own income tax returns prior to 1983. Prior to 1983, petitioner "occasionally dabbled in buying some mutual funds and occasionally *364 some stock". Petitioner had consistently "bad experiences" in making his own investments. [2] No later than 1983, petitioners decided to seek out new investments because they had moved into "a much higher pay bracket" and had more disposable income. Through his professional colleagues, petitioner learned of Graham & Associates, Inc. (Graham & Associates). Petitioners met with Thomas Graham (Graham), the president of Graham & Associates, for the first time late in the summer of 1983. In their contacts with Graham & Associates, petitioners dealt primarily with Graham and John Hootman (Hootman). Petitioners did not investigate or inquire about the expertise of either Graham or Hootman. Petitioners met with Graham a second time in the fall of 1983. The only investments proposed by Graham were those which were expected to provide tax benefits. It was at this second meeting that petitioners were told about the Saxon *365 Energy Corporation (Saxon). Saxon was a corporation formed in 1981 to lease energy management systems to the public. See Schillinger v. Commissioner, T.C. Memo. 1990-640, affd. per order 1 F.3d 954 (9th Cir. 1993) (discussing the Saxon Energy program in some detail). Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. Graham & Associates provided petitioners several documents relating to Saxon, including a copy of the Saxon Energy Corp. Energy Brain/Fuel Optimiser Equipment Leasing Program Information Memorandum (the Information Memorandum), a document entitled " Frequently Asked Questions About the Energy Brain/Fuel Optimiser Equipment Leasing Program", and a copy of a document entitled "Fair Market Value of Equipment $ 205,000". These documents contained limited information regarding the energy management systems such as an Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), an energy management device, and a comparatively extensive amount of information regarding the *366 potentially favorable tax consequences of leasing such a system. Petitioners also received from Graham & Associates a copy of a 1-1/2 page letter from Charles Taylor (Taylor) to Saxon indicating his opinion that the Energy Brain System's fair market value was $ 205,000. The letter, dated June 13, 1983, included a "vita criteria" providing limited information regarding Taylor's credentials. Petitioners obtained no appraisal, other than the foregoing, of the value of the Energy Brain System. Petitioners considered Graham & Associates to be representatives of Saxon. Petitioners conferred only with Graham & Associates regarding the risks and benefits of entering into a lease arrangement with Saxon. Petitioners conducted no independent investigation of Saxon, relying exclusively on Graham's representations as to Saxon. Moreover, petitioners never asked any third party to review the Information Memorandum or other Saxon documents on their behalf before undertaking to lease an Energy Brain System from Saxon. Petitioners understood that in order to receive tax benefits from an investment in the Energy Brain System in 1983, a payment would have to be made prior to the end of the taxable year. *367 An Agreement of Lease (the lease) dated December 27, 1983, and signed on December 31, 1983, was entered into by petitioners as lessees and Saxon as lessor. The term of the lease was 20 years. A Certificate of Insurance for the Energy Brain System named Saxon as the insured. The policy expiration date was December 1, 1984. Under the terms of the lease, petitioners were required to pay, and did in fact pay, an advanced guaranteed rental for the period December 31, 1983 through December 31, 1984 in the amount of $ 13,500 for their interest in the Energy Brain System. After petitioners made this payment, petitioners and a Saxon representative executed an Election to Pass Investment Tax Credits from Lessor to Lessee. Petitioners never intended to use the Energy Brain System themselves. Instead, petitioners planned to engage a management company, which would locate an end-user. The end-user would pay for the Energy Brain System by sharing equally the amount of energy savings with petitioners. The management company was to retain a fee of 15 percent of petitioners' share of the energy savings and remit the balance to petitioners. Petitioners were then required to pay Saxon 75 percent *368 of the remaining net income. Petitioners never negotiated the amount of the lease payment to Saxon. Petitioners never inspected, and have never seen, the Energy Brain System that they leased from Saxon. Petitioners entered into a management agreement (the management agreement), dated December 27, 1983, with ALH Energy Management Corp. (ALH) as the management company for the Energy Brain System. On that date, petitioners paid ALH $ 675 for management services. Petitioners relied upon Saxon to select ALH as the management company. By letter dated January 28, 1984, K.M. Fereg (Fereg) of ALH notified petitioners that the Energy Brain System had been placed in service in December 1983. The location of the Energy Brain System was identified in that letter as Dae Woo Food on West 36th Street, New York, New York. After entering into the lease, communications between petitioner and Graham regarding petitioners' investment in the Energy Brain System related primarily to concerns about the viability of the investment as a tax shelter. Susan Haselhorst (Ms. Haselhorst) is an expert in the fields of energy management systems, design engineering evaluation methods, and energy system modeling. *369 She prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Study). The preparation of the Study took 120 hours and utilized four experts who hold degrees in areas such as engineering and accounting. The cost of conducting the Study was approximately $ 15,000. In evaluating the fair market value and the profit potential of the Energy Brain System, Ms. Haselhorst considered, among other things, the Information Memorandum and other promotional literature, the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogues and magazines. She also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Study, Ms. Haselhorst concluded that the fair market value of the Energy Brain System did not exceed $ 795. She also concluded, on the basis of the Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. Petitioners do not dispute these conclusions. We think the conclusions are supportable *370 and adopt them as our own. See Schillinger v. Commissioner, T.C. Memo. 1990-640. During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed due to the nation's energy conservation needs. Energy management systems were available at the retail level for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and various monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980, 1981, and 1983. Petitioners attached to their 1983 income tax return, which was prepared by Graham, Form 3468 (Computation of Investment Credit). On that form, *371 petitioners reported a value of $ 205,000 for their interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment credit in the amount of $ 20,500. [3]
Petitioners also attached a Schedule C in respect of their Saxon investment to their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 13,500 and management fees of $ 1,354. Petitioners reported no gross receipts or sales in respect of the Saxon investment on the Schedule C. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable years 1980 and 1981 in the amounts of $ 12,747 and $ 6,124, respectively. [4]
*372 As previously indicated, petitioners concede the deficiencies in income taxes for 1980, 1981, and 1983. We need therefore only decide whether petitioners are liable for: (1) Additions to tax for negligence; (2) additions to tax for a valuation overstatement; (3) an addition to tax for a substantial understatement of income tax liability for 1983; and (4) the increased rate of interest under section 6621(c). OPINION Petitioners bear the burden of proof as to each of the additions to tax and the increased rate of interest. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Negligence
We begin with the additions to tax for negligence, the primary issue in this case. Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1983 impose an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would *373 employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Within this framework, petitioners may prevail if they reasonably relied on competent professional advice. Freytag v. Commissioner, 501 U.S. 868 (1991). However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which the taxpayers approached their investment. In this case, petitioners contend *374 that their actions, particularly their reliance on Graham & Associates, were reasonable. Petitioners cite Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, as authority for their position that their actions were reasonable. Petitioners' reliance on Heasley v. Commissioner, supra, is misplaced, because petitioners' circumstances are different than those of the taxpayers in the Heasley case. The taxpayers in Heasley had only high school degrees and extremely limited investment experience. Moreover, the Court of Appeals for the Fifth Circuit indicated that the taxpayers in Heasley both intended to earn an economic profit on the investment in issue and actively monitored that investment. Although petitioners have educational backgrounds similar to those of the taxpayers in Heasley v. Commissioner, supra, petitioners had investment experience prior to 1983. Petitioner described as "bad experiences" his previous efforts at investment. Accordingly, petitioners had reason to be cautious in approaching future investments. *375 Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. Petitioners' lack of knowledge regarding the proposed investment in the Energy Brain System, combined with their awareness of the need for caution, should have prompted them to conduct some independent investigation prior to investing through Graham & Associates, whom they regarded as representatives of Saxon. Nonetheless, petitioners conducted no independent investigation regarding either the reliability of Graham & Associates or the viability of the proposed investment in the Energy Brain System. We view this failure to inquire as imprudent and unreasonable. Moreover, the evidence falls short of demonstrating that petitioners had an interest in earning an economic profit from the Energy Brain System. Petitioners initially sought out Graham & Associates because they had been elevated to "a much higher pay bracket" and had more disposable income, and the only investments proposed by Graham were those that were expected to provide tax benefits. These facts suggest that petitioners' interest in *376 investing through Graham & Associates was to shelter their existing income from taxation rather than to generate additional income. Supporting our conclusion regarding petitioners' motivation is the fact that the information provided to petitioners by Graham & Associates contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of leasing such a system. The information they received was insufficient to indicate the profit potential of the investment they were considering. Petitioners' post-investment communications with Graham did not constitute an effort to monitor their investment. Rather, on the basis of the facts developed at trial, we find that the post-investment contacts with Graham related to concerns regarding the viability of the Energy Brain System investment as a tax shelter. Petitioners have failed to persuade us that their actions in connection with their investment in the Energy Brain System were reasonable in light of their experience and the nature of their investment. Accordingly, we sustain respondent's determination with respect to the additions *377 to tax for negligence for each of the years in issue. Valuation Overstatement
We turn now to the addition to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Sec. 6659(b). Section 6659 does not apply, however, to underpayments of tax that are not attributable to valuation overstatements. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987)(where taxpayers were not entitled to claimed investment tax credits because property was not placed in service during the years in issue, the underpayment was not attributable to a valuation overstatement). *378 On their 1983 income tax return, petitioners claimed a value of $ 205,000 for their interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment tax credit of $ 20,500 and utilized $ 2,983 of that amount to reduce their reported income tax liability (exclusive of the alternative minimum tax) for 1983 to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 13,500 and a management fee of $ 1,354. On Forms 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable years 1980 and 1981 in the amounts of $ 12,747 and $ 6,124, respectively. On the basis of the Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. We must now decide whether the deficiencies in income taxes for 1980, 1981, and 1983 are attributable to such overstatement. See, e.g., Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), *379 affg. T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427; Urbanski v. Commissioner, T.C. Memo. 1994-384. [5]
In this instance, the deficiency determined by respondent for 1980 resulted from the disallowed carryback of investment credit from 1983 pertaining to petitioners' Saxon investment. Accordingly, we sustain respondent's application of the addition to tax under section 6659(a) to the entire underpayment for the taxable year 1980. We also sustain respondent's application of the addition to tax under *380 section 6659(a) to the underpayment for the taxable year 1981. Here we note that the underpayment for that year is $ 7,451. Of this amount, $ 6,124 is attributable to the disallowed carryback of investment credit from 1983 pertaining to petitioners' Saxon investment. The balance, or $ 1,327, is attributable to the carryback of investment credit from 1984, which the parties have stipulated is not allowable. The parties have also stipulated to the applicability of section 6659 to the portion of the deficiency for 1981 not attributable to petitioners' Saxon investment. Finally, we sustain respondent's application of the addition to tax under section 6659(a) to such part of the underpayment for the taxable year 1983 that is attributable to the valuation overstatement, namely, the amount relating to the disallowed investment tax credit, i.e., $ 2,983. The balance of the underpayment is attributable to the disallowed Schedule C expenses relating to petitioners' Saxon investment, and, as respondent correctly determined, that balance is not attributable to the valuation overstatement. Substantial Understatement
We turn next to the addition to tax for substantial understatement of *381 income tax under section 6661(a) for 1983. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount attributable to a substantial understatement. [6] An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). [7]
In determining the amount of the addition to tax for which taxpayers are liable, section 6661(b)(3) provides: *382 "there shall not be taken into account that portion of the substantial understatement on which a penalty is imposed under section 6659". "The portion of the understatement on which the penalty under section 6659 has been imposed is taken into account, however, in determining whether there is a substantial understatement of tax." Sec. 1.6661-2(f)(1) and (2), Income Tax Regs. (emphasis added). Because the understatement for 1983, which petitioners have conceded, exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000, the addition to tax under section 6661(a) applies. Sec. 6661(b)(1)(A). We therefore sustain respondent's determination that the addition to tax under section 6661(a) applies to that portion of the understatement not subject to the addition to tax under section 6659; i.e., $ 2,433 ($ 5,416 - $ 2,983). Increased Rate of Interest
Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to 1 or more tax-motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See *383 DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988)(the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before the date of enactment of section 6621(c)). Respondent determined that petitioner was liable for the increased rate of interest because the underpayments for the years in issue are attributable to tax-motivated transactions. Section 6621(c)(3)(A)(i) provides that the term "tax-motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))". Accordingly, in light of our conclusion that a valuation overstatement exists for 1980, 1981, and 1983, we are bound to sustain respondent's determination under section 6621(c) with respect to the deficiency in each of those years that relates to the valuation overstatement. In addition, section 6621(c)(3)(A)(v) also provides that the term tax-motivated transaction includes "any sham or fraudulent transaction". Economic shams, or transactions which lack economic substance, fall within the ambit of section 6621(c)(3)(A)(v). *384 Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). Petitioners introduced no evidence that the Saxon transaction was not an economic sham. Accordingly, we sustain respondent's determination that petitioners are liable for the increased rate of interest under section 6621(c) with respect to the deficiencies for 1980, 1981, and 1983. [8]
Conclusion
In order to reflect our disposition of the *385 disputed issues, as well as the parties' concessions and stipulations, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence, i.e., $ 7,451 for 1981; $ 5,416 for 1983; and $ 3,349 for 1984.↩
2. Respondent amended her answer to plead, in the alternative, that in the event that the Court concludes that the addition to tax under section 6659 does not apply, the addition to tax under section 6661(a) should be increased to $ 1,354.00, or 25 percent of the entire deficiency, rather than 25 percent of the portion of the deficiency not attributable to an overvaluation of property.↩
2. Throughout this Opinion we use the term "invest" and its derivatives solely for the sake of convenience.↩
3. Of this amount, petitioners utilized $ 2,983 on their 1983 return in order to reduce their reported income tax liability (exclusive of the alternative minimum tax) for that year to zero.↩
4. The sum of these two amounts equals $ 19,171. Petitioners computed such number as follows: ↩
1983 investment credit
$ 20,500
Less: amount claimed in 1983
-2,983
Balance
17,517
Plus: 1983 ITC $ 2,983
1983 AMT -1,654
+1,654
Unused ITC for carryback
19,171
5. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980) is "attributable to" the adjustments in the later year, sec. 6659 may be applied to taxable years prior to 1981. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
6. Having concluded that petitioners are subject to the addition to tax for a valuation overstatement under sec. 6659(a), we need not address respondent's alternative argument, advanced in her amended answer, that sec. 6661(a) should apply to the entire deficiency for 1983.↩
7. An understatement will be reduced to the extent that it is: (1) Based on substantial authority or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In this case, the understatement for 1983 was neither based upon substantial authority nor adequately disclosed.↩
8. We note that the parties have also stipulated to the applicability of sec. 6621(c) to the portion of the deficiency for 1981 not attributable to petitioners' Saxon investment.↩